# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SYMBIONT.IO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0407-JTL |
| | ) | |
| IPREO HOLDINGS, LLC, IPREO LTS LLC, | ) | |
| IHS MARKIT LTD., and MARKIT NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| IPREO HOLDINGS, LLC, IPREO LTS LLC, | ) | |
| IHS MARKIT LTD., and MARKIT NORTH | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYMBIONT.IO, INC., | ) | |
| | ) | |
| Counterclaim Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SYNAPS LOANS LLC, | ) | |
| | ) | |
| Nominal Counterclaim Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: May 25, 2021
Date Decided: August 13, 2021

William M. Lafferty, Susan W. Waesco, Sara Toscano, MORRIS, NICHOLS, ARSHT &
TUNNEL LLP, Wilmington, Delaware; Daniel A. Mason, PAUL, WEISS, RIFKIND,

WHARTON & GARRISON, LLP, Wilmington, Delaware; Andrew G. Gordon, Jaren Janghorbani, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Plaintiff and Counterclaim Defendant Symbiont.io, Inc.*

Blake Rohrbacher, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Dana M. Seshens, Daniel J. Schwartz, Nikolaus Williams, DAVIS POLK & WARDWELL LLP, New York, New York, *Attorneys for Defendants and Counterclaim Plaintiffs Ipreo Holdings LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc.*

**LASTER, V.C.**

Symbiont.io, Inc. and Ipreo LTS, LLC[1] established a joint venture. By combining forces, Symbiont and Ipreo planned to revolutionize the secondary market for syndicated loans. Symbiont committed to provide distributed ledger and smart contract technology. Ipreo committed to provide a management team with expertise in the syndicated loan industry, an existing user interface with patented loan trade servicing technology, and procedures and know-how for streamlining the processes involved in servicing and trading syndicated loans.

Symbiont and Ipreo entered into an agreement to govern their joint venture (the "JV Agreement"). They implemented their joint venture through Synaps Loans LLC, a Delaware limited liability company (the "Company" or the "Joint Venture").

The Company's prospects were bright. A single product called ClearPar, owned by IHS Markit Ltd. ("Markit"),[2] commanded a monopolistic 99% share of the market for intermediary services for syndicated loans. Markit had not made material improvements to ClearPar since acquiring it in the aughts, and the secondary market for syndicate loans was

---

[1] Ipreo LTS, LLC ("Ipreo Sub") is an indirect, wholly owned subsidiary of Ipreo Holdings, LLC, its parent company. Both are entities formed under Delaware law. For most purposes, the distinction between Ipreo Sub and Ipreo Holdings is not critical, and this decision refers to them together as Ipreo, except when a more specific designation is required.

[2] IHS Markit Ltd. ("Markit Parent") was formed in 2016 through the merger of IHS, Inc., an American firm, and Markit Ltd., a British firm. Markit Parent's shares trade on the New York Stock Exchange under the symbol "INFO." Markit North America, Inc. ("Markit Sub") is a subsidiary of Markit Parent through which Markit Parent acquired and owns Ipreo Holdings. The distinction between Markit Sub and Markit Parent is not significant, so this decision refers to them together as Markit.

notoriously inefficient. With a superior technological solution, the Company believed it could take market share from ClearPar, particularly if the Company had the backing of major industry participants.

By March 2017, the Company had completed a successful proof-of-concept demonstration of its technology. By early 2018, the Company was well on its way to securing equity financing from a syndicate of major banks. Four banks had signed a nonbinding term sheet under which they would invest in the Company and serve as its anchor customers. The Company needed at least one additional bank to close the financing round, and it had several prospects who were likely to invest.

Everything changed in May 2018 when Markit announced an agreement to acquire Ipreo. The idea that Markit would allow the Company to emerge as a competitor to ClearPar was an obvious non-starter. The Company's most promising investment prospect declined to sign the term sheet because of Markit's looming acquisition, and one of the cornerstone banks that had signed the term sheet reconsidered its support.

The Company's leadership team tried to convince Ipreo and Markit to carve out the Company from the acquisition. They pointed out that after the deal closed, Markit would be an affiliate of Ipreo, causing Ipreo to violate a non-competition provision in the JV Agreement unless Markit ran its ClearPar business through the Company. Markit refused to carve out the Company.

After the acquisition closed, Symbiont and the Company's CEO continued to stress that the acquisition had caused Ipreo to violate the non-competition provision. Markit made noises about negotiating a settlement, but dragged its feet. It was not until January 2019,

2

after Symbiont sent Markit a draft complaint, that Markit made a proposal. Three months later, Markit offered generous terms of employment to the Company's CEO, and he informally accepted. From that point on, activity at the Company effectively stopped. The Company's CEO formally resigned from his positions in November 2019.

This decision holds that Ipreo breached the non-competition provision in the JV Agreement as soon as Markit's acquisition of Ipreo closed because (i) the acquisition caused Markit to qualify as an "Affiliate" of Ipreo under the JV Agreement, (ii) Markit engaged in what the JV Agreement defined as the "Joint Venture Business" by offering its ClearPar product, and (iii) Markit did not run its ClearPar business through the Company. Both sides asserted other claims for breach of contract. Each side proved one additional claim, but those claims only support offsetting awards of nominal damages.

As a remedy for the breach of the non-competition provision, this decision enforces the contractual remedy called for by the JV Agreement. The relevant provision entitles the Company and the non-breaching party to an equitable accounting of the profits that the breaching party and its affiliates obtained. This decision holds Ipreo liable for damages in an amount equal to the profits that Markit generated from its ClearPar business between the date the acquisition closed and November 30, 2020.

Symbiont asks to receive half of the damages award. That would be one remedial solution, and it would treat the JV Agreement as an ordinary contract. The better approach is to direct Ipreo to pay the full award to the Company. The award to the Company also will fund the expenses associated with winding up the Company's affairs. That outcome will enable the Company to pay its creditors before making a liquidating distribution to its

3

equity holders. Symbiont will receive its share of damages through the distribution. Ipreo will receive half of the net amount as well, effectively reducing the damages award.

As the foregoing paragraph implies, the court will enter an order declaring that the Company is dissolved. Once Markit refused to let the Company pursue its business independently, the Company's demise became a matter of time. The Company's board of directors has been deadlocked since the CEO-director resigned in November 2019. It is no longer reasonably practicable to carry on the Company's business. The court will appoint a Delaware lawyer to serve as receiver to wind down the Company's affairs, then make a liquidating distribution to the Company's members.

Symbiont contends that Markit tortiously interfered with the JV Agreement and should be jointly and severally liable for the damages award. There is evidence to support that claim, but analyzing the issue requires a deep dive into a complex, multi-factor test. If Ipreo pays the damages award, then it will be unnecessary to adjudicate the claim against Markit from a remedial perspective. Rather than burden an already long opinion with further analysis, this decision severs and stays Symbiont's claim against Markit. Should it prove necessary to adjudicate that claim, then Symbiont may renew it.

## I.    FACTUAL BACKGROUND

During a five-day trial, six fact witnesses and three experts testified live via the Zoom videoconferencing platform. The parties introduced 718 exhibits. They lodged twenty-one deposition transcripts, with thirteen from fact witnesses and eight from

experts.[3] Post-trial briefing concluded on April 16, 2021.[4] The court held post-trial argument on May 25, 2021.

The events at issue occurred over a four-year period, starting in late 2015 and ending in 2019, yet the parties only agreed to twenty-six stipulated facts in the pre-trial order. The parties agreed to virtually no stipulations of fact for the crucial period from November 11, 2016, to May 20, 2018, which represents the entire period of the Company's operations. This decision relies on the few factual stipulations that the parties provided.[5]

Each side advanced claims against the other. Accordingly, each side bore the burden of proving the facts supporting its claims. The following facts were proven by a preponderance of the evidence.

## A.    The Business Opportunity In The Secondary Market For Syndicated Loans

Ipreo is a financial information firm that provides market intelligence, data, and technology solutions to participants in the global capital markets. PTO ¶ 8. Before the acquisition that led to this litigation, Ipreo Holdings was an indirect subsidiary owned by

---

[3] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit, with the page designated by the last three digits of the control number or internal page number. If a trial exhibit used paragraph numbers or sections, then references are by paragraph or section.

[4] *See* Dkt. 202, Pl.'s Opening Post-Trial Br. ("POB"); Dkt. 207, Defs.' Opening Post-Trial Br. ("DOB"); Dkt. 210, Pl.'s Answering & Reply Post-Trial Br. ("PRB"); Dkt. 221, Defs. and Countercl. Pls.' Post-Trial Reply Br. ("DBR").

[5] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Dkt. 173.

the Blackstone Group L.P. and Goldman Sachs Group, Inc. (the "Ipreo Sponsors"). *Id.* ¶ 10. Ipreo Sub was a wholly owned indirect subsidiary of Ipreo Holdings. *Id.* ¶ 9.

In 2013, Ipreo identified a business opportunity in the secondary market for syndicated loans. A syndicated loan involves a group of lenders extending credit to a single borrower, often to finance a venture that a lender would not underwrite on its own. The market for syndicated loans consists of a primary market and a secondary market. In the primary market, syndicates of lenders originate loans and allocate portions of the loans to the lenders who are members of the syndicate. In the secondary market, investors can buy and sell interests in already-funded loans. In 2019, the volume of trading in syndicated loans exceeded $740 billion. JX 635 ¶ 42.

Syndicated loan trading is information-intensive and requires extensive coordination among industry participants. Under the current system, each participant must maintain its own records, and there is no centralized record of ownership for loan interests. Tessier Dep. 41–42; JX 635 ¶ 62. The market is beset by two major problems: (i) "the use of millions of facsimile messages annually to share data among lenders," and (ii) "slow trade settlement [times] that take[] 20 business days on average." JX 268 at '856; *see* Salerno Tr. 595. Unlike most financial instruments that can be purchased and settled within days, the *median* settlement time for a secondary non-distressed loan trade was as high as 16 days in 2013 and remained at 11 days in 2019. JX 635 Ex. 11; Smith Tr. 13–15.

Transactions in the secondary loan market generate millions of dollars in annual revenue for the intermediaries who facilitate them. JX 644; JX 645. Markit controls more than 99% of the market for intermediary services through its ClearPar product. JX 8 at

6

'848; JX 12 at '420; JX 97 at '115; Salerno Tr. 710–11. ClearPar is an electronic platform that facilitates trading and settlement by automating parts of the process. JX 268 at '890.

Markit had done little to update ClearPar since buying the product in 2009. *Id.* at '887, '890; Salerno Tr. 713, 715–16. The lack of product improvement perpetuated objectively poor levels of operational efficiency, resulting in widespread user dissatisfaction and causing long and unpredictable settlement timelines to persist. JX 268 at '890–91; Salerno Tr. 716–17.

Ipreo sought to challenge Markit by developing a product called "Loan Trade Settlement," or LTS. The platform used a software algorithm to automate certain manual tasks. Joseph Salerno, a twenty-five-year industry veteran, led the effort.

By 2015, Ipreo had patented the LTS platform, but Ipreo struggled to gain traction against ClearPar. Salerno believed that LTS would be a more attractive, comprehensive, and valuable solution if delivered using distributed ledger technology, commonly called a blockchain. JX 268 at '858; Salerno Tr. 592. Salerno also anticipated using smart contracts to automate additional aspects of the loan settlement and servicing process. At the time, blockchain and smart contracts were hot concepts. Ipreo thought a solution using those technologies would appeal to industry participants. *See* JX 268 at '868; Marcus Tr. 485.

**B.      Ipreo Approaches Symbiont.**

In December 2015, Ipreo met with Symbiont. Founded in 2013, Symbiont remained in quasi-startup mode. Symbiont sought to use distributed ledger technology and smart contracts to revolutionize aspects of the financial industry. It targeted markets that involved over-the-counter trading and low transparency. Symbiont's leadership team included Mark

7

Smith, its Chief Executive Officer; Evan Wagner, its Chief Operating Officer, and Adam Krellenstein, its Chief Technology Officer.

The Symbiont team welcomed the idea of partnering with Ipreo. JX 9 at '636. As a first step, Symbiont gave Ipreo access to an investor presentation and virtual data room that Symbiont had created to raise capital. In the investor presentation, Symbiont represented that it was "building a platform that allows financial market participants to create . . . self-executing digital contracts that are stored in a distributed database called a 'blockchain.'" *Id.* at '643. The presentation claimed that six months earlier, in August 2015, Symbiont had "completed its first Smart Securities issuance" on a blockchain "by putting its [own] cap table and securities on the Bitcoin Blockchain." *Id.* at '644. Symbiont described the issuance as a "[s]uccessful proof of concept." *Id.* at '644. Symbiont had already focused on the syndicated loan market as a business opportunity, and the investor presentation discussed how Symbiont's technology could revolutionize the primary and secondary markets. *See id.* at '647–51. The presentation also made clear that Symbiont was exploring a wide range of opportunities in the financial markets. *See id.* at '653–56.

In this litigation, Ipreo has asserted in passing that Symbiont "misrepresented the state of the technology." DOB 8. It is true that Symbiont's technology was less mature and less sophisticated than Ipreo initially believed. *See* Salerno Tr. 625–26. But Ipreo has not asserted fraud, and the statements that Symbiont made about its technology were puffery. Persuasive puffery, but puffery nonetheless.

8

## C. The Initial Term Sheet

On February 11, 2016, Ipreo and Symbiont executed a nonbinding term sheet. It called for the parties to form a joint venture and contemplated that each side would contribute $500,000 in cash. JX 15 at '846. In addition, Ipreo would provide "[e]mployees with specific expertise with syndicated loans led by Joe Salerno" and intellectual property in the form of the "LTS process solution," the "LTS user interface" and "software application interfaces to third party systems that provide administrative agent services and loan portfolio management services." *Id.* Symbiont's additional contributions would include team members and intellectual property in the form of a non-exclusive, non-transferable perpetual license to Symbiont's "SmartLoan" technology. *Id.*

The parties anticipated that the Joint Venture would profit by capturing market share from incumbent vendors. The principal incumbent was ClearPar.[6]

## D. The Revised Term Sheet

In March 2016, Smith and Salerno renegotiated Symbiont's capital contribution. Symbiont was working already with Credit Suisse and R3, another financial technology startup, to develop a proof-of-concept ("POC") demonstration for Symbiont's "Smart

---

[6] *See* JX 8 at '848; JX 12 at '421; Marcus Tr. 554; Salerno Tr. 710–11, 724–28; Smith Tr. 15; *see also* JX 16 at '748 (Ipreo board member noting that one of the primary purposes of the Joint Venture would be to "pursu[e] the opportunity to enhance the loan trade settlement process, and thereby, compete with Markit's Clearpar solution"); JX 19 (Salerno email to Symbiont, noting that a representative from Credit Suisse "openly stated that our JV could displace Markit"); JX 24 (Salerno noting that "moving settlement business from Markit to the JV is [a] critical component of the deal").

Loans" product. JX 19; JX 21 at '581–82. Emmanuel Aidoo headed the blockchain effort at Credit Suisse. In a meeting with Salerno, Aidoo said that the Smart Loans product could be a "rocket engine" for Ipreo's LTS product. JX 19.

Prompted by Aidoo's comment, Salerno and Smith discussed whether the Smart Loans product should be part of the Joint Venture. Salerno thought it should be; Smith insisted it was not. Then, in early April 2016, Aidoo made clear that Credit Suisse wanted Ipreo and its LTS product to be part of the POC demonstration. JX 21 at '581; JX 22. He also stated that Credit Suisse and the other institutions were "willing to sign commercial contracts upon success of the proof of concept—but only if they have some opportunity to gain equity in the solution provider." JX 22.

Based on Aidoo's comments, Smith and Salerno realized that the Joint Venture would have the best chance of success if it included Symbiont's Smart Loan business. That meant renegotiating some of the basic terms of the deal. *Id.*

In May 2016, Salerno and Smith revisited the initial term sheet, which had contemplated that both sides would contribute cash up front and that Ipreo would receive a larger equity stake in the joint venture. *See* JX 15 at '846. Smith did not want Symbiont to contribute cash up front unless Symbiont received an equal share of the equity. Salerno and Smith revised the term sheet so that the initial 64-36 equity split in Ipreo's favor would vest at an equal 50-50 equity split once the Company executed agreements with five qualifying customers. JX 809 at '051–53; *see also* JX 142 at '249. They also agreed that Symbiont would not be required to make an upfront cash contribution *if* Symbiont continued to develop its Smart Loan platform and provided a version of the platform that

10

constituted a minimum viable product ("MVP") at no cost to the Joint Venture.[7] JX 23 at '949; JX 809 at '051–53; JX 28 at '090; JX 30 at '098–99. If Symbiont delivered a qualifying version of the Smart Loan platform, then its obligation to make a cash contribution would be waived. JX 809 at '051; JX 28 at '090; JX 30 at '098–99. If Symbiont did not deliver an MVP, then it would be obligated to contribute $360,000 in cash. OA § 3.01(b) (defined below).

By the end of May 2016, Smith and Salerno had hammered out the business terms in a revised term sheet, and they tasked their counsel with preparing definitive agreements. Although Smith and Salerno did not know it at the time, negotiating and finalizing the agreements would take six months. Smith was the key negotiator for Symbiont, and Salerno and Clayton Albertson, another Ipreo employee, were the key negotiators for Ipreo. *See* Marcus Tr. 491–92; Smith Tr. 119; Albertson Tr. 982; Ganeles Dep. 56.

## E.    The Proof-Of-Concept Demonstration Is Delayed.

After agreeing on the revised term sheet, Symbiont and Ipreo prioritized the proof-of-concept demonstration for Credit Suisse and other financial industry participants. They codenamed the effort "Project Journe." JX 29. The goal of Project Journe was to "confirm that syndicated loans can [be] managed securely and completely as a Smart Loan on a

---

[7] A proof of concept and minimum viable product differ in important ways. The purpose of a proof of concept is to demonstrate the feasibility of a product without demonstrating its scalability or production readiness. A minimum viable product, on the other hand, must be a version of the product that can be released to real customers with minimum features that allow them to engage with the product. JX 636 Ex. 4.

11

distributed ledger." *Id.* at '281. They also hoped the demonstration would provide "proof of commercial viability." *Id.*

The parties initially envisioned the demonstration taking place in November 2016. *Id.* at '266. Almost immediately, however, resource constraints within Symbiont affected the schedule. Symbiont had taken on a number of projects, and it was not clear that Symbiont had sufficient resources to complete them all. In October 2016, Wagner, Symbiont's COO, told Krellenstein, Symbiont's CTO, that Symbiont was "understaffed" and "simply d[id] not have the resources to work on five projects in 3 months." JX 41 at '096–97.

By the end of October 2016, Symbiont's staffing problem had worsened. Wagner believed that Symbiont had three developers with the technical chops to work on smart contracts. JX 42. One left in October. JX 636 ¶ 114. A second could not work under the time pressure that the schedule for Project Journe imposed. JX 42; *see also* JX 41 at '096; JX 636 ¶ 114; Krellenstein Dep. 111–12. That meant Symbiont had just one developer who could work on the smart contracts. Aaron Todd, one of Symbiont's software engineers, believed that Symbiont needed to slow down, otherwise they would "slow down when we fail to deliver due to instability." JX 79 at '148; *see also* Krellenstein Tr. 270–72; JX 41; JX 42.

Because of Symbiont's limited resources, the Project Journe demonstration was postponed until March 2017. Symbiont used the delay to shift resources to other commitments. Symbiont did not work on the smart contracts for Project Journe between late October and the end of the year. JX 103 at '220–21. Symbiont also did not make any

meaningful improvements to its underlying blockchain platform, called Assembly. "[A]ll development resources [had been] dedicated to other projects." Krellenstein Tr. 275; *see* JX 103 at '219.

## F.    The Parties Sign The Transactions Agreements.

On November 11, 2016, Symbiont and Ipreo executed the definitive agreements for the Joint Venture. PTO ¶¶ 15–16 (the "Transaction Agreements"). The key agreements were:

- The JV Agreement. *See* JX 47 (the "JV Agreement" or "JVA").

- The limited liability company agreement that governed the Company. *See* JX 48 (the "Operating Agreement" or "OA").

- A Technology Development and Use Agreement. *See* JX 50 (the "Technology Agreement" or "TA").

- A Management and Administrative Services Agreement. *See* JX 52 (the "Services Agreement" or "SA").

The JV Agreement is the principal agreement at issue in the case. The parties rely to a lesser extent on the Operating Agreement, the Technology Agreement, and the Services Agreement.[8]

---

[8] There were three other Transaction Agreements that do not play a significant role in the case: (i) a contribution agreement among the Company, Ipreo Sub, and Symbiont, JX 49; (ii) a software escrow agreement among the Company, Symbiont, and Iron Mountain Intellectual Property Management, Inc., JX 54, and (iii) a registration rights agreement among the Company, Ipreo Sub, and Symbiont, JX 53.

13

## 1. The JV Agreement

The JV Agreement was the overarching agreement that governed the Joint Venture. The parties to the agreement were Symbiont and Ipreo Sub. Ipreo Holdings signed for the purpose of binding itself to certain provisions, including the restrictive covenants and remedial provision at issue in this case.

In the JV Agreement, the parties agreed that they had formed the Company for the purpose of engaging in the "Joint Venture Business" and would "develop and operate the Company in accordance with the Transaction Agreements." JVA § 2.2. The JV Agreement defined "Joint Venture Business" by adopting the definition that appeared in the Operating Agreement. JVA § 1.22. The latter agreement defined the term as "the sale of products and services necessary or appropriate for the Servicing and Settlement of Commercial Loans," and "any and all activities necessary or incidental thereto." OA § 2.05(a).

From their earliest discussion, the parties agreed that neither participant would be allowed to compete with the Company. Smith Tr. 23; Marcus Tr. 499–500; Salerno Tr. 599–600, 725; Albertson Tr. 999–1000. Reflecting this agreement, the first draft of the JV Agreement contained restrictive covenants, and those provisions persisted largely unchanged in the final agreement. *Compare* JX 18 at '380–81 *with* JVA § 4.4(a)(i).

Section 4.4 of the JV Agreement, titled "Exclusivity," contained the restrictive covenants. Two figure prominently in this case.

First, the JV Agreement contained a non-competition provision that provided as follows:

14

[N]one of Ipreo LTS, Ipreo Holdings, Symbiont nor their respective Affiliates shall, without the prior written consent of the other,

(i)    during the period that it or its Affiliates holds a ten (10) percent or greater direct or indirect ownership interest in the Company, and

(ii)   (A) for one (1) year thereafter, or (B) in the event that during such period the Company ceases to engage in the Joint Venture Business, then for one (1) year thereafter;

directly or indirectly, on its own behalf or on behalf of another Person:

. . . own, manage, operate, jointly control, finance or participate in the ownership, management, operation, control or financing of, or be connected as a partner, principal, manager, agent, representative, consultant, advisor, promoter or otherwise assist (financially or otherwise) with or participate in, or use or permit its name or the name of any of its Affiliates to be used in connection with, any business or enterprise that is engaged in the Joint Venture Business anywhere in the world (the "Territory") except through the Company and the Joint Venture . . . .

JVA §4.4(a)(i)(x) (the "Non-Competition Provision") (reformatted).

Second, the JV Agreement contained a non-solicitation provision that provided as follows:

[N]one of [Ipreo Sub], Ipreo Holdings, Symbiont nor their respective Affiliates shall, without the prior written consent of the other, . . . directly or indirectly . . . induce, solicit or attempt to influence any employee or consultant of the Company, Ipreo, Ipreo Holdings, Symbiont or their respective Affiliates to terminate his or her employment with any such Person, or in any other manner interfere with or attempt to interfere with, in any way, the relationships of the Company, Ipreo, Symbiont or their respective Affiliates with any employees, officers, managers, agents, suppliers, vendors, independent contractors, Customers or otherwise.

*Id.* § 4.4(a)(i)(z) (the "Non-Solicitation Provision").

Prohibited conduct by Symbiont, Ipreo, or "their respective Affiliates" would breach the restrictive covenants. The JV Agreement contained a definition of the term "Affiliate," and that term was used throughout the JV Agreement. *See Id.* § 1.1 (the

"Affiliate Definition"). The meaning of the Affiliate Definition figures prominently in the case, and this decision discusses it in the Legal Analysis, *infra*.

The JV Agreement sought to limit the parties' respective obligations to their contractual commitments and avoid extra-contractual duties. The JV Agreement specified that "[n]othing contained in this Agreement or any of the other Transaction Agreements shall be deemed to create a partnership entity among any of Ipreo LTS, Ipreo Holdings, Symbiont or any of their respective Affiliates." *Id.* § 4.9(a). The JV Agreement also disclaimed any agency relationship that might otherwise enable Ipreo, Symbiont, or any of their respective Affiliates to act "as a legal representative or agent of another Party or the Company." *Id.* § 4.9(b).

## 2. The Operating Agreement

The Operating Agreement governed the internal affairs of the Company. The members of the Company were Symbiont and Ipreo Sub. Their interests tracked the term sheet: Initially, Ipreo held 64% and Symbiont 36%, but the interests would vest equally at 50% each if the Company secured five customers.

The Operating Agreement delegated broad authority to the CEO to carry out the business of the Company, with only limited oversight by a three-member board of directors (the "Board"). The operative provision stated:

> The Company's Chief Executive Officer shall manage the day-to-day operations, business and affairs of the Company and shall have the power to make decisions regarding the operations of the Company, reporting as required herein to the Board; *provided* that the Board may delegate the day-to-day operation of the Company to the Officers. Except as otherwise specifically set forth in this Agreement, the Board shall have all of the rights

16

and powers of a "manager" under the Delaware [LLC] Act and otherwise as provided by applicable law.

OA § 7.01. Salerno served as CEO and exercised the authority conferred by this provision.

Symbiont and Ipreo each had the right to appoint a director. *Id.* § 7.02(a)(ii), (iii). Symbiont appointed Smith, and Ipreo appointed Albertson. The third seat was reserved for the CEO. *Id.* § 7.02(a)(i). Because Salerno served as CEO, he filled that seat.

Like the JV Agreement, the Operating Agreement sought to limit the parties' respective obligations to their contractual commitments and avoid extra-contractual duties. In addition to other provisions to that effect, the Operating Agreement stated:

> [E]ach of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

OA § 8.02(a). The term "Covered Person" meant "(i) each Member; (ii) each officer, director, stockholder, partner, member, Affiliate, employee, agent or representative of each Member, and each of their Affiliates; and (iii) each Officer and Director of the Company." *Id.* § 8.01(a). The Operating Agreement used the same Affiliate Definition that appeared in the JV Agreement. *See id.* § 1.01 at '676.

While serving as CEO of the Joint Venture, Salerno technically remained an Ipreo employee, but he was assigned to the Company full time. Salerno Tr. 588–89. George Barker, an Ipreo software engineer, joined the Company under the same arrangement as its Loan Development Manager. JX 64 at '096.

17

### 3. The Technology Agreement

The Technology Agreement governed Symbiont's obligations to provide technology to the Company. The parties to the Technology Agreement were Symbiont and the Company. Ipreo was not a party.

The Technology Agreement contemplated that the Company's technology solution would combine three principal components: (i) Assembly, Symbiont's underlying blockchain platform; (ii) smart contracts running on Assembly to execute tasks associated with servicing and settling loans; and (iii) a set of user interfaces to allow loan market participants to access the platform. Krellenstein Tr. 203–05; JX 636 ¶¶ 30–31.[9]

The Technology Agreement called for Symbiont to develop and provide the Company with access to the "SmartLoans Platform," comprising versions of Assembly and smart contracts that collectively met specifications set forth in "Statement of Work #1." TA §§ 1.33, 2.1; *see also* JX 51 (the "Statement of Work" or "SOW"). The Statement of Work required that the SmartLoans Platform "conform in all material respects with" two categories of requirements—functional and operational. SOW § 4. Without a hint of irony, the parties and the Statement of Work also referred to the operational requirements as "non-functional" requirements. *Id.* § 4.1.

---

[9] The following analogy illuminates the relationship between Assembly and the smart contracts: "[I]f Symbiont Assembly is Windows, then the smart contracts are Microsoft Word. And instead of being used for editing Word documents, they're used for managing interactions among the participants." Krellenstein Tr. 205.

The functional requirements identified functions that the platform would perform. They included assigning account identities and roles; originating a loan facility; and creating, reading, and updating loan-related actions. *See id.* § 4.2; JX 636 ¶ 39.

The operational requirements identified attributes that the platform needed to have to operate effectively. They included:

- Replication, which allowed data to be shared across nodes;

- Security, which permitted only authorized users to access the network;

- Scalability (or "performance"), which required that the platform be capable of processing sufficient transactions to "meet the estimated demand of the syndicated loan market in North America";

- Consensus, which required that the primary network participants regularly agree on the current state of the blockchain;

- Auditability, which prevented historical data from being deleted or revised unintentionally;

- Privacy, which allowed only permitted users to access encrypted data; and

- Upgradability, which enabled the platform's code to be updated without disrupting the blockchain.

*See* SOW § 4.1; JX 636 ¶ 38.

The Statement of Work called for Symbiont to "deliver the version of the SmartLoans Platform embodying the specifications set forth in this SOW, which is referred to in the Operating Agreement as the 'Minimum Viable Product,'" no later than the last day of the "SOW Term." SOW § 1. The SOW Term began on November 11, 2016 and ended "on the date that is six (6) months thereafter, unless extended in accordance with Section 3.01(b) of the Operating Agreement." *Id.*

19

Symbiont's initial deadline for delivering the MVP was thus May 11, 2016. Section 3.01(b) of the Operating Agreement gave the Company's CEO the right to extend the deadline for up to three additional months, "in his sole and absolute discretion to the extent [he] determines significant progress has been made toward the Minimum Viable Product." OA § 3.01(b). If Symbiont did not meet the original deadline or, if extended, the extended deadline, then Symbiont was required to contribute cash in the amount of $360,000. If Symbiont met the deadline, then its obligation to make a capital contribution to the Company in cash was waived. *Id.*

Ipreo claims that Symbiont failed to fulfill its obligations under the Technology Agreement, which Ipreo claims led to breaches of various sections of the Operating Agreement and JV Agreement. This decision discusses those sections in the Legal Analysis, *infra*.

### 4. The Services Agreement

The Services Agreement governed Ipreo's obligations to provide services to the Company. The parties to the Services Agreement were Ipreo Holdings and the Company. Ipreo Sub and Symbiont were not parties.

The services that Ipreo Holdings agreed to provide included the following:

(a) management services comprised of the following as agreed between the Parties: executive services (Chief Executive Officer, Chief Operating Officer, Chief Technology Officer, General Counsel, etc.)[;]

(b) sales and support services . . . [;]

(c) marketing services comprised of assistance with events, conferences, advertising and promotion[;]

20

(d)     development services comprised of provision of R&D activities related to the development, QA testing and maintenance of software products associated with the SmartLoans software platform[;]

(e)     operations and general administrative and overhead services comprised of the following:

   1.   finance and accounting services, including maintaining books and records, billing and collections, treasury, expenses and payments, regulatory tax filings, financial reporting and payroll[;]

   2.   legal services, including contract negotiations and management, regulatory compliance, employee matters, litigation matters and general corporate matters; [and]

   3.   information technology (IT security, network operations, network engineering, help desk)[;]

(f)     application hosting[;]

(g)     insurance as may be agreed between the Parties[; and]

(h)     such other services as the Parties may agree[.]

SA at '776 (Schedule 1) (reformatted). Acknowledging that it was impractical to create "an exhaustive description of the Services," Ipreo Holdings and the Company agreed that they would "act in good faith and cooperate with one another to refine or amend the description of the Services so as to best support the Company's business." *Id.* § 1.3. As compensation, the Company "agree[d] to reimburse [Ipreo] Holdings for all costs and expenses reasonably incurred by [Ipreo] Holdings" in providing the services, plus "an administrative fee equal to 10%." *Id.* §§ 3.1, 3.2.

Symbiont claims that Ipreo Holdings failed to fulfill its obligations under the Services Agreement, which Symbiont claims led to breaches of various sections of the JV Agreement. This decision discusses those sections in the Legal Analysis, *infra*.

21

## G. The Concurrency Bug

After not assigning resources to Project Journe between late October and December 2016, Symbiont re-engaged in January 2017. Krellenstein tasked Ouziel Slama, Symbiont's Principal Software Engineer, with writing the smart contracts for Project Journe. JX 69; Krellenstein Tr. 282–84. Slama only worked on them part time because he was busy fixing issues with Assembly. Krellenstein Tr. 277–80, 287–88; JX 83 at '837; JX 87. To fulfill his responsibilities, Slama had to "work 12 to 15 hours a day," which made him "not very efficient." JX 42; JX 61 at '980–81; Krellenstein Tr. 281–82. No one else was available. JX 155 at '127. Salerno believed that the lack of any other programming resources was "throttling [the Company's] progress." Salerno Dep. 597.

At the end of January 2017, Symbiont stopped work on the smart contracts so that Slama could work full time on Assembly. *See* JX 79; JX 87. The platform had developed a "concurrency bug" that caused transactions to be lost when users executed them simultaneously. Salerno Tr. 626–27; Krellenstein Tr. 290–91; JX 636 ¶¶ 94, 97; JX 155; JX 199; JX 201. Wagner, Symbiont's COO, described the concurrency bug as a "landmine." JX 110 at '454; *see* Unny Tr. 1107–08. Salerno was alarmed to learn about a problem with Symbiont's core infrastructure. *See* JX 87; Salerno Dep. 599.

For Symbiont, the concurrency bug was "an 'all hands on deck' thing." JX 83 at '837–38. Krellenstein and Wagner were "seriously concerned about the [platform's] stability." *Id.* at '838. They assigned six developers to the issue, and Krellenstein rejected Salerno's request to redirect one of them to smart contracts. *Id.* at '837.

22

In an update to Ipreo executives on February 10, 2017, Salerno provided a blunt but measured report. He explained that the Company "missed an interim milestone for the release of the initial node deployment package," which was "dependent on Symbiont's resolution of some system stability issues." JX 90 at '614. He also noted that another interim milestone was in jeopardy because of Symbiont's resource constraints, but he believed that Project Journe's "end goals remain[ed] achievable." *Id.*

Salerno provided another update on March 10, 2017. He reported that Symbiont had "remedied several problems" and that the team was "running into problems less frequently with each run through of the demo." JX 100 at '560. Nonetheless, he described the platform as "uncomfortably fragile" and noted that "we still get unexplainable bugs and node failures." *Id.*

In the days leading up to the Project Journe demonstration, Symbiont and Ipreo's developers continued to view the concurrency bug as "a nightmare." JX 102 at '516; *accord* JX 155 at '128. As a temporary workaround, Symbiont added a three-second lag "between clicking a link and [a] dialog opening." JX 102 at '517. The developers did not like building in a delay, but the alternative was "total failure." *Id.*

## H.     The Project Journe Demonstration

The Project Journe demonstration took place on March 15, 2017. Hours before the demonstration, Krellenstein prepared his team for the possibility that the concurrency bug would appear. He was sufficiently concerned that he sent the same Slack message twice to the entire group:

23

[P]lease be prepared for the distinct possibility that the notice [will] reappear during the demo. We were not able to diagnose it or work around it. . . . [P]lease have every participant in the demo finish what they are doing before moving on to the next participant. Don't let anyone do things at the same time.

JX 901 at '441; JX 98 at '410. Krellenstein emphasized to Salerno that "i[f] the bug reappears, don't let everyone on the [demonstration] hear the disappointment in your voice!" JX 901 at '441; JX 98 at '410; *accord* JX 110; JX 155 at '128–29. Krellenstein and Salerno agreed that if the bug appeared, they would "ignore or gloss over" it. JX 901 at '442. As Krellenstein put it, "[i]f it happens *just move on*." JX 901 at '442. Krellenstein went so far as to instruct the team to give a dishonest explanation if the bug manifested: "[A]s far as the audience is concerned, it's an intermittent, minor error, that didn't show up in testing. [T]hat's how it has to be played." JX 110 at '454.

To minimize the risk of participants taking actions concurrently, the demonstration was "highly scripted." Salerno Tr. 629–30. The demonstration consisted of four "acts," each of which involved different participant institutions taking on a role—e.g., agent, lender, custodian, buyer—and taking actions on the platform to model a syndicated loan transaction. JX 101 at '107.

About 200 people dialed into the demonstration, which lasted about ninety minutes. JX 127 at '546; *see* JX 107. Nineteen financial firms participated, with fifteen entering dummy data to model a transaction. JX 127 at '547.

24

The demonstration went well, and the concurrency bug did not appear. Participants gave the demonstration largely positive reviews.[10] U.S. Bank believed the Company had "the most automated solution [it had] seen to date." JX 124 at '102. State Street Bank agreed and "looked forward to further advancement of this pilot." *Id.* at '103. A representative from Credit Suisse remarked that "Synaps still has some testing to do on its platform, but the majority of its functionality already is present." JX 127 at '547. Barclays also responded favorably but declined to describe the technology as "production ready" or "ready for live service." JX 119 at '272.

The parties hoped that the participants in the demonstration would invest in the Company and eventually become customers. Credit Suisse appeared likely to invest, and Aidoo caused Credit Suisse to issue a press release reflecting strong support for the Company. JX 124 at '102–05; *see* JX 127 at '549.

Smith portrayed the demonstration as a resounding success. In an email to Ipreo executives dated March 17, 2016, he praised Salerno and the Company's team:

> I am sure you are aware that Synaps successfully completed our POC on March 15, 2017. The deliverable was a historic event not just for Synaps, IPREO and Symbiont but for the whole DLT [(distributed ledger technology)] ecosystem. I wanted to congratulate Joe on successfully

---

[10] *See, e.g.*, JX 120 at '096 (representative from Oak Hill Advisors: "Besides the obligatory hiccup, it went very well. We believe it was a great showcase of the technology."); *id.* (second representative from Oak Hill Advisors: "I think the project and the demo has been a great first step."); JX 124 at '103 (senior consultant at TenDelta LLC: "This proof-of-concept takes a significant step toward a new syndicated loan operating paradigm.").

shepherding us through the project, it was a big ask and he performed admirably.

JX 112.

When communicating outside the Company, Salerno likewise praised the demonstration as a success. *See* JX 120 at '096–97. Internally, Salerno was more measured. He sought to "balance the very, very good with the serious concerns that [he] ha[d] about the maturity of the platform." JX 141. Salerno agreed that Project Journe had demonstrated a proof of concept, but the Joint Venture had not met its goal of debuting a production-ready version. Salerno believed that "a Q1 2018 go-live is possible" but "not likely." *Id.*

## I.     Symbiont Refactors Assembly.

By March 14, 2017, the day before the Project Journe demonstration, Symbiont's developers had reached the conclusion that Assembly needed to be refactored. JX 103 at '213–19. In techno-speak, refactoring entails improving software code that already exists. Rewriting, by contrast, involves discarding existing code and starting over. Symbiont's development team estimated that they would complete the refactoring by June 2017. JX 103 at '214–16, '218–19, '223; Krellenstein Tr. 300–01. Krellenstein told Salerno that refactoring would address the concurrency bug. JX 111 at '866.[11]

---

[11] The Symbiont team did not achieve their goal, and by November 2017, the refactoring still was not complete. *See* Krellenstein Tr. 307. Wagner, Symbiont's COO, later attributed the significant delays to Krellenstein's "explicitly negligent" and "reactive" approach to project management. Krellenstein Dep. 309; Wagner Dep. 149–52, 184–87, 307–09; JX 103; JX 306 at '587; JX 636 ¶ 135.

26

Symbiont's decision to refactor Assembly meant that work could not continue on the smart contracts. *See* JX 103 at '214–15. They remained in a nascent state, and they lacked the functionality for an MVP. Salerno Tr. 632–34. Slama wanted to "rewrite all the contracts from scratch." JX 164 at '443. Other Symbiont developers described them as "too flawed to be salvaged" and "f—ed." JX 103 at '212–13; JX 200. Wagner regarded the status of the smart contracts as "seriously disturbing." JX 103 at '220.

On May 5, 2017, Salerno reported to Ipreo that Assembly had "scalability and replay-ability issues." JX 142 at '248. He advised that "[i]t would be wasteful to continue to develop smart contracts until the re-platforming is complete." *Id.*

## J. The Dispute Over Whether Symbiont Had Satisfied The Statement Of Work

In early May 2017, a dispute erupted between Salerno and Smith over whether the Project Journe demonstration satisfied the requirements in the Statement of Work. The catalyst was the provision in the Operating Agreement that permitted Salerno to extend Symbiont's deadline to deliver a minimum viable product in lieu of making a cash capital contribution. Salerno Tr. 608–11. The initial six-month window for Symbiont to deliver an MVP that met the requirements in the Statement of Work ended on May 11, 2017.

The disagreements over whether Symbiont had delivered an MVP dated back to the Project Journe demonstration. When the parties began work on Project Journe, they thought that the software used for the demonstration "could align with the SOW entirely." Salerno Tr. 633. After the delays, however, they realized that completing an MVP was impossible, so they narrowed the goal to "just meeting the needs of the demonstration script." *Id.*; *see* JX 155 at '127. Two days after the demonstration, however, Smith claimed that Symbiont

27

had "accomplished our MVP." JX 112. Skeptical that the demonstration satisfied the requirement, Salerno tasked Barker, the Ipreo software engineer who worked as the Company's Loan Development Manager, with comparing what Symbiont had provided with the specifications in the SOW. JX 113. Barker concluded that Symbiont had not yet met several operational requirements including scalability, security, consensus, replayability, auditability, and upgradability. *Id.*

Over the following six weeks, Symbiont worked on improving the platform's scalability. *See* JX 114. At the same time, the Company developed load tests that could "assess the platform's ability to scale." JX 124 at '099. By mid-April, however, Symbiont had shifted its resources to the refactoring effort, and Smith asked Salerno to stop pursuing the load test issue. *See* JX 137.

On May 5, 2017, Salerno elected to extend the deadline for Symbiont to deliver a minimum viable product. He provided the following report to the Board:

> The Synaps Operating Agreement requires that Symbiont deliver an MVP product by May 11[th]. This has not yet occurred. As allowed by the Agreement, I am extending that deadline by three months because I can determine that "significant progress has been made toward the Minimum Viable Product..." The most important product gaps between the current platform and the MVP defined in the SOW involve scalability and replay-ability. There are functional gaps as well. We have discussed these gaps with Symbiont and will send a proper list before the end of next week. As we discussed at the board meeting, I hope and expect that meeting the strictures of the SOW will become irrelevant. I would prefer to address the dev priorities as set by customers rather than those written in the SOW.

JX 142 at '249 (ellipsis original).

Salerno also advised the Board that it was likely no longer possible for Symbiont to achieve the conditions for a 50-50 equity split, so he proposed an alternative:

28

The Synaps Operating Agreement: (1) assumes that I will be able to separate distributed-ledger license fees from loan trade settlement fees and (2) enables Symbiont to attain 50:50 ownership with Ipreo if Synaps signs five "Qualified Customer Agreements" with sufficient distributed-ledger license fees in the vesting period ending 11-11-2018. I now know that the assumption is flawed because customers will only sign contracts with Synaps if we deliver both a distributed-ledger platform and settlement services. If we successfully complete the fundraising round then we should abandon this concept in favor of a straight 50:50 split.

*Id.* Smith thanked him. *See* JX 155 at '130. The Board later approved the 50-50 vesting of ownership. *See* JX 179 at 16; JX 183; JX 185.

Salerno, however, wanted to make sure that Symbiont understood that it had not yet fulfilled its obligations. He therefore circulated an email on May 12, 2017, in which he stated, "Symbiont has not yet completed its obligation to deliver against the SOW." JX 148 at '101. As support, he provided a document titled "Update on SOW to Tech Agreement" that identified nineteen "gaps" between the existing platform and the requirements in the SOW. JX 171 at '882–83.

Smith and Krellenstein reacted emotionally to Salerno's professional yet firm email.[12] Half an hour after receiving Salerno's second email, Smith responded via Slack:

---

[12] Krellenstein demonstrated emotional reactivity on prior occasions. In January 2017, Krellenstein sent a message to Salerno in which he accused Barker, an Ipreo engineer, of "trying to sabotage the project" and exhibiting "extreme dishonesty." JX 75 at '820. Salerno tried to calm the waters, but Krellenstein remained emotional. JX 72 at '793. Krellenstein and Wagner also complained to Smith that Salerno was sending them "on wild goose chases" based on concerns about Symbiont's technology that were "indisputably unfounded." JX 73 at '325. Smith explained that Salerno simply wanted "up to date and accurate reporting," but he also characterized the Synaps team as "a bunch of wilting flower cry babies." *Id.* at '325–26.

"I am not pleased with the email you just sent on SOW. It is blatantly false on most points. We need to have a very candid meeting to flesh out all these points as you have no idea what you are taking [sic] about." JX 146.

Salerno tried to reassure Smith that he recognized the contributions that Symbiont had made, responding: "Symbiont has meaningfully delivered; it is not a complete delivery per the SOW." JX 146. He added that as long as "we continue to plod forward then delivery to the SOW should become irrelevant." *Id.* Smith, however, could not let the issue go, and he responded later that afternoon with a summary that he characterized as "the actual state of our deliverables." JX 150 at '892. Salerno attempted to defer the issue to another day, but noted that the Company was "reserving its rights under the contract." JX 151 at '880–81. Smith escalated: "Reserving its right under the contract? Really. I think we will start to do the same. Let's get together and start taking [sic] about the performance of LTS front end and current Dev team. I think some changes are in order." *Id.* at '880.

After his exchange with Salerno, Smith reoriented the Symbiont team to "focus . . . squarely on addressing [Salerno's] concerns around the SOW." JX 159 at '988. Smith told Salerno that he would provide "a formal presentation to you, the board, and the executive team at IPREO to clarify and demonstrate the current state of the platform and [Symbiont's] specific Synaps deliverables." *Id.*

Salerno did not want Symbiont expending resources fighting about the past. He wanted to move forward. Smith nevertheless insisted that he needed to "respond to [the] suggestion that Symbiont has not met its obligations under the SOW before proceeding

30

onto any other work." JX 905; *see* JX 169 at '400. Salerno and Smith agreed that Symbiont would demonstrate its technology to the Board on June 2, 2017, two weeks later.

Three days before the demonstration, Smith told Salerno that Symbiont needed more time to prepare because the Company had "never supplied performance requirements." JX 172 at '832. That same day, Krellenstein tried to persuade Salerno to waive the requirements in the SOW, but Salerno would not concede that the demonstration for Project Journe satisfied the SOW's requirement for a "production-ready system." JX 173 at '059. Krellenstein again reacted emotionally, telling Salerno that he "threw around stupid, uninformed accusations" and that if he maintained them, "there won't be any progress going forward." *Id.* at '060. Salerno remained professional, explaining that there were gaps between the product and the SOW and expressing optimism that if the Company got to the point where it was responding to customer priorities, then "meeting the strictures of the SOW will become irrelevant." *Id.* at '061.

On May 31, 2017, Smith cancelled the demonstration, explaining that Symbiont had been focused on other issues. JX 176 at '865–66. The parties met on June 2 as scheduled, then again on June 8. JX 187. There were "high volume arguments coming from both sides" and "abundant personal resentment," but Salerno, Smith, and Krellenstein managed to reach agreement on a series of points. *Id.* at '861. The only remaining disagreement concerned Symbiont's development priorities. Salerno wanted a new development plan that would culminate in a pilot project based on minimum viable product. JX 186; JX 187. Symbiont would not undertake a new pilot project unless the Company waived or changed the SOW requirements. JX 186; JX 187.

31

## K.     The June 2017 Demonstration

On June 14, 2017, Symbiont demonstrated the current state of its technology for Salerno and Ipreo's technology team. *See* JX 193. During the demonstration, Symbiont successfully established that they had met all of the operational requirements in the SOW, other than the performance requirements. *Id.* at '726–27. On the performance front, the Symbiont team agreed that their technology was "well below what is required for a production deployment." *Id.* at '726. Symbiont also did not attempt to show that they had met the functional requirements of the SOW. *Id.* Symbiont instead "promised to deliver a response to the deficiencies that [Salerno had] identified" one month earlier. *Id.* at '727. Salerno observed that "[t]here was an evident change in tone from the Symbiont team towards a more open, collegial discussion about their technology," which Salerno described as "a good step in the direction of rebuilding 'trust.'" *Id.* at '726.

Even though it was obvious that Symbiont had not met the requirements of the SOW, Symbiont refused to concede that point. In an update circulated on June 21, 2017, Salerno described Symbiont's position as follows: "Symbiont believes that it has met this obligation, but is open to either: (a) redressing identified gaps to the SOW or (b) a reasonable alternative delivery obligation." JX 205 at '697.

After the demonstration, the Ipreo team concluded that the system's performance issues were solvable, but would take considerable work. JX 193 at '726. After further testing, the Ipreo team concluded that Symbiont's technology could not operate at scale without an overhaul. *See* JX 195 at '348. Internally, Symbiont recognized the shortcomings

in both Assembly and the smart contracts. *See* JX 199 at '839 (Krellenstein: "They should be concerned. It is a showstopping bug."); *see also id.* at '835; JX 200.[13]

## L.     The Waiver Of Symbiont's Capital Contribution

The extended deadline for Symbiont to deliver a minimum viable product was August 11, 2017. If Symbiont failed to deliver, then Symbiont would be obligated to contribute $360,000 in cash to the Company. OA § 3.01(b). With the deadline looming, Salerno confronted several unavoidable facts. First, Symbiont would not meet the August deadline. Second, continuing to work with Symbiont gave the Company its best shot at getting its technology platform. Although the Company needed funds, it really needed the technology.

Salerno therefore proposed to waive Symbiont's cash contribution and the requirements of the SOW in return for an agreement by Symbiont to devote resources to the technology. *See* JX 230; JX 232; Salerno Tr. 641–42. The parties agreed that until the earlier of the end of 2017 or a successful capital raise, Symbiont would dedicate two full-time developers to the smart contracts and one part-time developer to the front-end user interface. JX 232.

---

[13] Writing retrospectively one year later, Krellenstein and Symbiont's developers expressed similar opinions. In March 2018, Krellenstein quipped, "I don't think we have an MVP yet." JX 306 at '600; *see also* JX 407 at '853 (Todd: "[W]e need the baseline thing ready to turn on and off . . . and we failed to define that long ago and so built the wrong things for a year."). In July 2018, a new Symbiont developer described the smart contracts as "quite a mess" and "[n]ot [usable] as-is." JX 450.

On August 11, 2017, Salerno formally notified the Board that Symbiont had failed to meet the extended deadline for delivering a minimum viable product. JX 232; Smith Tr. 51. In light of the parties' oral agreement about Symbiont's commitment, Salerno and the Company did not seek to enforce Symbiont's obligation to make a capital contribution.

It was not until December 2017 that the parties formally documented their agreement in the form of a Unanimous Written Consent of Board of Directors and Members. JX 271 at '981 (the "Board Consent"). As relevant here, the parties agreed that,

> immediately prior to the closing of the Financing, Symbiont will have met all of its obligations set forth in Section 3.01(b) of the [Operating] Agreement with respect to the [MVP] and Symbiont's Capital Contribution [and that] Symbiont's obligation to make the Capital Contribution set forth in Section 3.01(b) of the [Operating] Agreement is hereby extinguished and forever waived as of the earlier to occur of [(i)] the closing of the Financing and (ii) March 31, 2018.

*Id.* at '981. The Board Consent defined "Financing" as "the next sale of any equity units of the Company to any third party." *Id.*[14]

Salerno had proposed that the Board Consent also memorialize the parties' oral agreement that Symbiont would fulfill its capital contribution by providing the services necessary to keep moving forward with software development until the Company completed a strategic financing. JX 269 at '726. As documented, however, the Board

---

[14] In June 2017, the Board had approved vesting Symbiont's 50% member interest. *See, e.g.*, JX 185. The Board Consent memorialized that decision. JX 271 at '981, '98. Technically, the Board Consent vested all but one unit of Symbiont's member interest and retained the restrictions on that single unit. The parties have not addressed that issue and have proceeded as if it had no implications for the Company or this dispute. The court takes the same approach.

34

Consent did not require Symbiont to provide any resources. It merely stated that Symbiont's obligation to make a capital contribution was waived as of March 31, 2018, unless the Company sold equity to a third party at an earlier date. JX 271 at '981.

Symbiont did not assign two full-time developers for the smart contracts and one part-time developer to the front-end user interface. Symbiont originally dedicated two resources to smart contracts—Slama and Riccardo Abbate, a developer who had never worked as a commercial software developer and had no experience with blockchain technology or smart contracts. Slama left Symbiont in mid-2017, leaving Abbate as the only developer working on the project. Abbate stopped working on the smart contracts in November 2017. Krellenstein Tr. 307; Abbate Dep. 31, 112–13, 351–60.

Instead, Symbiont devoted resources to other projects. Symbiont had made many commitments and was simultaneously working on projects for the State of Delaware, Deloitte LLP, Orebits.io, PrivateMarket.io, the Hong Kong Stock Exchange, and the Vanguard Funds. JX 636 Ex. 7; *see also id.* ¶¶ 126–128. In May 2017, Smith had made Vanguard the "number 1 priority." JX 140 at '694. In January 2018, Symbiont started a mortgage project with Ranieri Partners. JX 286 at '313. By the middle of 2018, Symbiont had added two additional Vanguard projects: an asset-backed securities project and a foreign exchange project. JX 443 at '528–32.

## M.     The Company Nearly Secures Equity Financing.

Salerno's other major challenge in 2017 was to raise at least $10 million in equity financing from participants in the syndicated loan market who would double as the Company's anchor clients. *See, e.g.*, JX 154 at '251. Salerno hoped to close the financing

by June 2017, but progress was slow. He nevertheless remained optimistic. In a report to the Company Board on May 5, he presented a "Commitment Probability Report." JX 142 at '250. He identified "Expected" commitments from thirteen firms totaling $23 million. He rated four investors as 75% likely to invest, representing a probable commitment of $5.25 million. He rated five investors as 50% likely to invest, representing a probable commitment of $5 million. And he rated three investors as 25% likely to invest, representing a probable commitment of $1.5 million. One bank had already declined to invest. *Id.*

The main problem was timing. Salerno expected the Company to run out of money at the end of June 2017. *Id.* at '248. In the best possible case, any new investments would arrive at the end of July, and it could take until early 2018. *Id.* To conserve cash, the Company reduced its headcount and gave up its office space. Salerno and the rest of the Company's employees began working out of Symbiont's offices.

By July 2017, Salerno had not secured any investments, and the Company was out of cash. From November 2016 until June 2017, Ipreo had billed the Company between $80,000 and $90,000 per month for the services it provided under the Services Agreement. *E.g.*, JX 95; JX 128; JX 139; JX 175; JX 211. In an update on July 20, 2017, Salerno informed Ipreo that "Synaps has insufficient funds to pay Ipreo's June invoice." JX 223 at '788; *see* JX 211. As a temporary solution, Symbiont and Ipreo each provided the Company with a bridge loan in the amount of $250,000. JX 223 at '788; JX 271 at '982.

In December 2017, Citi, Credit Suisse, and U.S. Bank signed a nonbinding term sheet to invest $17.7 million in return for a 38.8% stake in the Company. JX 275. Citi's

commitment was especially important because the bank controlled "substantial market share" and other banks tended to follow Citi's lead. Salerno Tr. 775–76.

The nonbinding term sheet contemplated that the banks and the Company would "negotiate in good faith to enter into a commercial agreement" to use the Company's technology as its anchor customers. JX 275 at '961–62; *see also* Smith Tr. 64; Salerno Tr. 770–71. Completing the strategic partnership with key players was crucial to the Company's long-term success, both as an endorsement and because the funding would enable the Company to "get the product off the ground." Salerno Tr. 589–90.

Because of a regulatory cap on the amount of equity that a single bank could own, the Company needed at least one more investor before the financing could close. The banks wanted two more investors. Salerno had been courting non-bank firms, but the banks would not accept a non-bank investor. Salerno Tr. 653; JX 337; JX 424 at '374.

In January 2018, Synaps lined up Deutsche Bank as the fourth bank. JX 816. Salerno tried to convince the four committed banks to close, but they wanted one more. JX 331.

Salerno pursued every possible avenue to find a fifth investor. Everyone thought that a fifth bank would invest by the end of March 2018, as shown by the parties' willingness to waive Symbiont's capital contribution "as of the earlier to occur of [(i)] the closing of the Financing and (ii) March 31, 2018." JX 271 at '981.

Instead, Salerno received a series of rejections.[15] Ipreo reassured Salerno that it would "keep funding" the Company, believing that Salerno was on the cusp of securing the final investor that the Joint Venture needed. JX 333.

The Company's best prospect was BNP Paribas ("BNPP"). *See* JX 330 at '292; JX 378 at '075. BNPP had engaged a consultant that evaluated the Company and recommended an investment. Salerno Tr. 772. Based on feedback from BNPP's head of loan syndication in the United States, Salerno believed that BNPP was "95% likely" to invest. JX 530 at '023; Salerno Tr. 771–73. On May 4, 2018, Salerno reported that he "expect[ed] BNPP to sign the term sheet next week." JX 364. But BNPP still needed to obtain signoff from a key decision maker. JX 370.

Salerno also made progress with Nasdaq Ventures. That firm was ready to sign the term sheet, but the banks had not approved a non-bank co-investor. Salerno positioned Nasdaq Ventures as "'Plan B' should BNPP not sign." JX 364.

## N.     Rumors Of Markit's Acquisition Of Ipreo

The ground beneath the Company began to shift in May 2018, as rumors circulated in the financial industry that Markit was in talks to acquire Ipreo (the "Acquisition"). After hearing the rumors, Salerno informed Kevin Marcus, Ipreo's President and Chief Operating Officer, that Ipreo would violate the Non-Competition Provision if the Acquisition closed.

---

[15] Several banks declined to invest. *See* JX 310 (UBS); JX 317 (Santander); JX 316 (Bank of New York); JX 361 (Wells Fargo). Several non-bank prospects also passed. JX 301 (PPC Enterprises); JX 312 (Western Asset); JX 313 (Route 66 Ventures); JX 326 (Core Innovation Capital).

JX 365; Salerno Dep. 574–75; Salerno Tr. 731–33. Around May 9, 2018, Salerno met with Scott Ganeles, Ipreo's CEO, and told him the same thing. He implored Ganeles not to include Ipreo's interest in the Joint Venture in the sale. JX 504 at '913; Salerno Tr. 737.

Ganeles told Salerno that he would "ask [Markit] to keep Synaps out of the sale." JX 504 at '913. Markit rejected the request. *Id.*; Salerno Tr. 740.

Markit's acquisition of Ipreo was not driven by a desire to acquire Ipreo's interest in the Company. The value of the Company was not material to the deal, and Markit had broad strategic reasons for buying Ipreo. Nevertheless, acquiring Ipreo's interest was a nice benefit. At least as early as September 2016, Markit had recognized that its ClearPar business faced a "risk of disruption" from innovative ventures like the Company. JX 60 at '720. Another subsequent presentation identified "Ipreo/Symbiont" as a competitor. *See* JX 97 at '115. Several months later, Markit's board of directors received a presentation about the "[c]onstant threat of new technologies and new vendors" in the loan space, including "new emerging technologies (block chain/DLT)." JX 130 at '970.

Markit had taken steps previously to undermine the Company. Markit targeted participants in the Project Journe demonstration in an attempt to "pull them out" of the project. *See* JX 91 at '441. Markit also offered discounts to its ClearPar clients if they would abandon their support for the Company. Salerno Tr. 644, 718–20. For example, in April 2018, shortly after Markit employees anticipated that the Company's platform might

39

be ready soon for Credit Suisse to use, Markit offered a generous volume-based discount to Credit Suisse for the first time. *See* JX 282; JX 353; Tessier Dep. 314–18.[16]

During due diligence, Markit sent Ipreo a list of questions about the Company and sought to schedule meetings to discuss the Company. *See* JX 356 at '154; JX 348 at '233. Ipreo did not want to provide information about the Company to its dominant competitor and refused to schedule any meetings. Albertson Tr. 1007–08, 1012. Ipreo only provided Markit with the Transaction Agreements. *See* JX 367 at '574; JX 349 at '221; JX 358 at '446; Albertson Tr. 1005.

Through its due diligence, Markit identified the Non-Competition Provision and the risk that Markit could qualify as an Affiliate of Ipreo. After learning of the provision, Markit posed the following question to Ipreo senior management: "Based on your read and the original commercial intent of the draftsmen, would the non-compete in the Synaps JV Agreement be binding on an acquirer of the Company and its affiliates or is it limited to the existing Ipreo group?" JX 368 at '072. Ipreo declined to answer. Moore Dep. 95–97. Markit also flagged the Non-Competition Provision as a risk in a series of due diligence

---

[16] Markit witnesses denied any linkage. *See* Tessier Dep. 246 ("Q. Did IHS Markit ever offer discounts or lower fees to its customers in order to dissuade them from pursuing or switching to blockchain providers? A. Not to my knowledge."); *id.* at 254–67 (explaining that, in 2017, several "clients reached a threshold [volume] that would have entitled them to a discount for that higher level of trading pursuant to their contracts"); Kansler Dep. 115–17 (denying "aware[ness] of any discounts that IHSM offered any of its customers in connection with their consideration of investing in Synaps").

reports. *See* JX 369 at '580; JX 376 at '056. Markit decided to buy Ipreo regardless of whether or not the Acquisition triggered the Non-Competition Provision. Moore Dep. 128.

**O.     The Acquisition Announcement**

On May 21, 2018, Markit announced it would pay $1.855 billion to acquire Ipreo. PTO ¶¶ 20, 22. As noted, Markit's ClearPar product was the dominant provider of intermediary services for syndicated loans.

Salerno continued to believe that because Markit owned ClearPar, the Acquisition would cause Ipreo to violate the Non-Competition Provision. *See* JX 390; JX 394; JX 395 at '054; JX 396 at '310–11. Symbiont similarly believed that if the Acquisition closed, then Ipreo immediately would "violate several clauses of [the] JV [A]greement." JX 396 at '310.

Salerno thought the obvious solution was for Ipreo to sell its stake in the Company to a third party. *See* JX 403 at '515. Just eight minutes after seeing the public announcement of the Acquisition, Salerno emailed the four banks who had signed the term sheet to reassure them about the Company's future. JX 391. He explained that although the news of the Acquisition was "unsettling,"

> it is simply not possible for Ipreo's ownership stake in Synaps to move to IHS Markit due to non-compete provisions in our joint venture agreements. I expect that Synaps will be carved out of this transaction. I will now take the steps necessary to achieve that outcome or to secure an acceptable alternative by transferring the units owned by Ipreo to another party.

*Id.* Minutes later, Salerno told his contact at Nasdaq Ventures that the Acquisition would trigger a breach of the Non-Competition Provision. JX 389 at '723; Salerno Tr. 754–56.

Salerno said similar things to other prospective investors. As a non-lawyer, Salerno typically asserted that the Non-Competition Provision would prevent Markit from owning

41

Ipreo's share of the Joint Venture. *See* JX 390; JX 405; JX 410; Salerno Tr. 756–63. As a technical legal matter, Markit could own Ipreo's interest, but Markit's ownership would cause Ipreo to breach the Non-Competition Provision unless Markit either divested Ipreo's ownership stake or ran ClearPar through the Company, which Markit would not do. Salerno therefore believed that "Ipreo's ownership in Synaps cannot be part of this transaction." JX 394; *accord* JX 393.

An early consequence of the announcement of the Acquisition was the loss of BNPP as an investor. BNPP put the decision "on hold" until Synaps could "solve the carve out situation, have more clarity on time to market and more importantly get more traction." JX 416. Although BNPP cited other reasons, the Acquisition was the deal killer. Salerno testified credibly at trial that until the Acquisition became "an open secret in the bank strategic investment community," he believed that BNPP was "extraordinarily likely to invest." Salerno Tr. 773–74; JX 530 at '023. Another prospect, MassMutual, similarly declined to invest on the assumption that "the new Markit-Ipreo will not be too eager to continue codeveloping a Markit competitor." JX 405 at '419; *see* Salerno Tr. 760–62.

Another development took place the following month. On June 25, 2018, Citi informed Salerno that it was "withdrawing from the group investing in Synaps" because of "Markit's purchase of Ipreo and the long delay without securing a fifth bank." JX 430. Salerno feared that Citi's exit would "spook the other banks." JX 435. But on the bright side, he thought that Citi's exit might open the door to a non-bank investor. *Id.* Discouraged but undaunted, he continued his efforts to raise equity financing. Citi later backpedaled,

42

withdrew its withdrawal, and positioned itself "squarely on the fence." JX 453 at '650; *see* Salerno Tr. 753, 838.

**P.      Markit Refuses To Carve Out The Company Before Closing.**

Salerno initially convinced Ipreo's senior management team to consider selling Ipreo's interest in the Company. Marcus authorized Salerno to "get [Ipreo] a $10M offer on [its] shares . . . ." JX 403 at '514; *see* JX 404.

Salerno reached out to the potential non-bank investors he had been soliciting to suggest that they explore a purchase of Ipreo's stake.[17] He was optimistic that a consortium of six firms—the four banks plus Nasdaq Ventures and the Hearst Foundation—would invest and that he could bring in additional strategic investors in a second stage. JX 414; JX 418; JX 424 at '374.

On June 20, 2018, Salerno met with Adam Kansler, the president of Markit's financial services division. Kansler told Salerno that Markit would not hold up Salerno's efforts to identify a buyer for Ipreo's stake. JX 425. Kansler also suggested the possibility of a partnership between the Company and Markit. Kansler Tr. 882–83.

In July 2018, with the closing date for the Acquisition approaching, Markit backtracked. Kansler now proposed that Markit, Symbiont, and the Company first explore whether they could work together. JX 815 at '395–96. Smith demanded a prompt meeting

---

[17] *See* JX 389 (Nasdaq Ventures); JX 393 (Xerion Capital); *see also* JX 390 (Thomson Reuters); JX 394 (State Street Bank).

as a show of Markit's good faith. *Id.* at '395. The meeting did not take place for two weeks. *See* JX 456; JX 457.

After the meeting, Markit remained non-committal. Markit claimed that it needed more information about the Company and its technology before making a decision. *See* Kansler Tr. 889–90. No further discussions took place until after the Acquisition closed.

## Q. Markit Seals The Company's Fate.

The Acquisition closed on August 2, 2018. PTO ¶ 22. Markit's executive team evaluated their options, and by August 17, they had decided against continuing the Joint Venture. The ostensible reason was that Markit did not want to be dependent on Symbiont's technology. JX 468 at '552.

The Markit executives also decided that Markit would not sell Ipreo's stake. Instead, Markit was "only interested in buying Symbiont's shares." JX 504 at '915.

On August 30, 2018, Marcus contacted Smith, informed him about Markit's decision, and asked about buying Symbiont's stake. Smith demanded $13 million in cash, a long-term revenue-sharing agreement with Markit, and guaranteed use of Symbiont's technology. JX 481. Smith suggested any offer from Markit should take into account the liability Markit faced under the Non-Competition Provision. Marcus rejected the idea that there had been a breach. *Id.*

Marcus told Smith that Markit would prepare an offer for Symbiont's stake. For the next four months, however, Markit did nothing. "[D]oing nothing was a perfectly wonderful outcome for Markit," because it protected the ClearPar franchise. Salerno Tr. 828–29; *accord* JX 499 (Citi representative noting "the status quo suits Markit just fine").

44

## R.     The NewCo Concept

While awaiting an offer from Markit, Smith and Salerno "discuss[ed] the possibility of moving forward with a new entity." JX 477. This decision refers to the new entity as "NewCo" and the idea of pursuing a similar business through NewCo as the "NewCo Concept"

Before moving forward, Smith and Salerno sought legal advice from the Company's regular outside counsel on whether NewCo could use the Company's intellectual property, whether NewCo could pursue the Joint Venture Business without violating the Non-Competition Provision, and whether Salerno could use his authority as the CEO of the Company to convey its intellectual property to NewCo or Symbiont if the Company were dissolved. *Id.* at '614–15. Counsel advised that none of those ideas were viable. *Id.* at '614.

Smith and Salerno sought a second opinion from Goodwin Procter LLP. Goodwin generally advised against the NewCo Concept, but held out a slim chance based on a claim that Ipreo had committed a prior material breach that would excuse Symbiont and the Company from their obligations under the JV Agreement. JX 483 at '363.

Smith wanted to be aggressive, and he believed that Ipreo had committed a prior material breach of the Non-Competition Provision. He therefore proposed a two-track strategy. Along one track, he would negotiate with Markit to buy Symbiont's stake and license its platform. JX 485. Along another track, Symbiont would form NewCo "as a new clean vehicle for the banks to invest in" and "deliver a new term sheet to the banks." *Id.*

45

On September 15, 2018, Salerno told Smith that the NewCo Concept carried too much legal risk. JX 493 at '655. He did not think that they could proceed, "regardless of the material breach by Markit." *Id.* at '656.

In October 2018, Smith consulted with Cravath, Swaine & Moore LLP. JX 822. In contrast to the other firms, Cravath viewed the Company's prospects in litigation against Ipreo and Markit as "exceptionally bright." JX 502. Salerno began to think that Symbiont might be able to force a settlement that would make the NewCo Concept viable.

Smith had floated the NewCo Concept already. After Citi withdrew from the term sheet, Smith had asked Citi to consider an "alternative path forward that does not include IPREO or IHS Markit." JX 429. In October 2018, after receiving the bullish advice from Cravath, Smith and Salerno decided to "get the band back together." JX 527. By that, they meant approaching the banks about NewCo. *See* JX 502. They reached out to their contacts, and informal discussions resumed. *See also* JX 499; JX 500; JX 517; JX 518; JX 527.

During this period, given the Company's limited resources, Salerno managed expenses "to the minimum required to keep Synaps viable." JX 506 at '310–11. Salerno and three full-time colleagues constituted the core team. *See id.* at '311; JX 522 at '837. When the Company's Chief Technology Officer resigned in October, Salerno, Wagner, and Krellenstein decided that to conserve resources, Symbiont would take on his duties. A replacement was not hired. *See* JX 512.

Salerno and Smith liked the NewCo Concept because, by October 2018, it had become clear that that no one would invest in the Company if Markit owned Ipreo's stake. Salerno told the Company Board in October 2018 that "there is no investment interest in

46

Synaps with [Markit] in the cap table." JX 506 at '311. That same month, Citi's lead representative wrote internally that "[t]hat deal is all but dead as a result of IPREO being acquired by Markit." JX 499 at '637.

In November 2018, Salerno again told the Board that "it is not possible to complete th[e] financing with IHS Markit in the Synaps cap table." JX 522 at '837. In December, Salerno told Smith that "[t]he strategic investment leads from all four term-sheet banks told me that . . . an investment [in the Company] was certainly undesirable and probably impossible" as long as Markit owned Ipreo's share of the Joint Venture. JX 529.

At trial, Salerno described the Acquisition as "a deal killer." Salerno Tr. 762. He repeatedly confirmed that with Markit as an owner of Ipreo, no one would invest. Salerno Tr. 770, 782, 785, 786, 789. He also explained that without investments from the major banks, he "didn't see a way" that he could "move the technology and the business forward." Salerno Tr. 789. In an email from November 2018, Salerno observed that Markit had "not evidenced a shred of good will" in its treatment of the Company. JX 513 at '910.

S.    The Possibility Of A Settlement

Despite promising a settlement proposal in August 2018, Markit had never provided one. In November 2018, Cravath spoke with Markit's general counsel and suggested that both sides "walk away." Markit said it would respond, but never did. JX 513 at '910–11.

In January 2019, Cravath sent Markit a draft complaint. JX 821 at '108. The threat of litigation led to settlement discussions.

That same month, Smith sent Citi and Credit Suisse a preliminary draft of a proposed term sheet for the NewCo Concept. It contained signature lines for Citi, Credit

47

Suisse, U.S. Bank, Deutsche, State Street, and Barings. JX 536 at '531, '541. It also contemplated Salerno serving as NewCo's CEO. Smith Tr. 161; JX 536 at '533–34.

The plan was for Citi to take the lead in circulating the term sheet. JX 558 at '424. First, it would give Salerno, Smith, and Symbiont "plausible deniability if Markit makes claims that we interfere." JX 538 at '117. Second, it would send "a clear signal that Citi is in and is committed to getting the deal closed and running the business." *Id.* Citi understood and agreed. *See* JX 558 at '424.

Smith and Salerno testified credibly that the discussions about the NewCo Concept assumed that there would be a settlement with Markit, Ipreo, and the Company. *See* Smith Tr. 94–95, 98–100, 187–88; Salerno Tr. 807–08, 849–50; Salerno Dep. 315–16. In other words, they never intended for NewCo to compete against the Company absent a settlement. Smith Tr. 188; Salerno Tr. 849–50.

The settlement discussions, however, broke down. On January 31, 2019, Markit offered to buy Symbiont's equity for $5 million. JX 549 at '811. The price was low, and the offer contained other onerous terms, such as a demand for Symbiont to build and service a software platform for the Company, which Symbiont would license to Ipreo in exchange for per-trade royalties and a bonus if "the annual growth rate for [Markit's] ticket volume across all platforms exceed[s] 10%." *Id.* at '811–12. Markit also conditioned the deal on Salerno working for Ipreo. *Id.* at '812.

Symbiont countered by asking Markit to pay $15 million for its interest in the Company. Under Symbiont's proposal, the Joint Venture would dissolve, the parties would execute mutual releases, and the contributions of technology and intellectual property

48

would be rescinded. JX 551. Symbiont conditioned the deal on Markit "allow[ing] Joseph Salerno to continue working with Symbiont on a going forward basis." *Id.*

In March 2019, the parties reached an oral agreement, but were unable to reduce it to writing. JX 562 at '316–18. When the settlement talks broke down, discussions over the NewCo Concept ceased. The idea never went anywhere. NewCo was never formed, and a term sheet was never signed. Smith Tr. 94, 98.

## T.      The Battle For Salerno

As suggested by the parties' competing settlement proposals, both Symbiont and Ipreo wanted to secure Salerno's services. After Markit sent Symbiont a buy-out proposal on January 31, 2019, and after Symbiont countered on February 6, Marcus and Smith spoke by phone on February 9. They discussed a potential resolution in which both sides would "walk away" from the Company. Marcus Tr. 540–42. During this call, Marcus raised the issue of Salerno's future. Believing that Smith had already talked to Salerno about working for NewCo, Marcus asked Smith whether he would object if Markit also spoke with Salerno about a position. Marcus Tr. 541. Smith responded, "'Joe is free to trade. Neither side owns him. He can come to work for either one of us or somewhere else, as far as I'm concerned.'" Marcus Tr. 541–42.

At that point, Marcus told Smith, "'I just want to make sure we're clear and there's no confusion, you're not going to then turn around and use this back against me, or I'm going to hang up the phone and have a conversation with Joe about coming to work for IHS Markit.'" *Id.* Smith responded, "Yeah, we're clear. You are free to do that, and we're

going to do the same.'" *Id.* at 542. He then added, "'Good luck.'" *Id.* Marcus felt that Smith thought he had the inside track on getting Salerno. *Id.*; *accord* Marcus Dep. 349–51.

Salerno was in the same room with Smith and heard their "explicit conversation about soliciting my employment in the future." Salerno Tr. 682; *accord* Salerno Dep. 10–15. The documentary record corroborates the testimony. *See* JX 577 at '954; JX 578; *see also* JX 549 at '812; JX 551.

In March 2019, Kansler contacted Salerno about working for Markit. He offered Salerno (i) an annual salary of $300,000 ($50,000 more than what he was earning as CEO of the Company), (ii) a guaranteed minimum bonus of $300,000 in his first year of employment (at the Company, Salerno had no guaranteed bonus), and (iii) an additional bonus of $1.5 million at the end of three years. On top of that, Markit offered to purchase Salerno's shares in Ipreo Sub—the entity that held Ipreo's stake in the Company—for $3 million. *See* Salerno Tr. 694–96; JX 601 at '315, '327.

In April 2019, Salerno informally accepted Markit's offer. With the goal of being transparent, Salerno told Smith about his decision. At the time, Salerno and other Company employees were working in Symbiont's offices. Smith told them they would no longer be welcome after Friday, April 12. Smith also cut off the Company's access to Symbiont resources. JX 579 at '928. On Monday, April 15, Salerno returned to Symbiont to say goodbye. JX 571 at '240. Smith escorted him off the premises. JX 572 at '242.

Salerno set up shop in Markit's offices. Despite having informally accepted Markit's job offer, he did not formally resign his positions with the Company. But he was sufficiently concerned about conflicts of interest that he canceled meetings with the

50

Company's potential investors. On April 16, 2019, he asked for legal advice from Markit's in-house counsel, who advised him to "be careful to avoid appropriating for IHS Markit a business opportunity that began with Synaps." JX 576.

Salerno responded by cancelling meetings with US Bank on April 16–17 and Deutsche on April 19. JX 575; JX 576. He told a colleague at Markit that he "very much want[ed] to put Synaps behind me and get started." JX 576. It would have been prudent for Salerno to resign from his positions with the Company as soon as he informally accepted the offer from Markit.

## U. This Action

On May 31, 2019, Symbiont filed this action against Ipreo and Markit. Ipreo answered and filed counterclaims.

After the filing of this litigation, all activity on the Company's behalf came to a stop. Continuing to occupy an uncomfortable dual role as both the Company's CEO and a *de facto* employee of Markit, Salerno told the Board on June 28, 2019, that "the only prudent course" was for the Company "to stop all expenditures related to its operations." JX 587 at '077. Smith objected, citing Ipreo's "breach of its obligations under the JV Agreement." *Id.* at '076.

On October 29, 2019, Salerno formally accepted an offer to become a "Platforms Strategy VP/MD" with Markit effective November 1, 2019. PTO ¶ 24; JX 601 at '327. On November 14, Salerno formally resigned as the Company's CEO. PTO ¶ 25; JX 604. The Company has not had a CEO since then.

51

On November 25, 2019, Salerno formally resigned as a member of the Board. His departure left Smith and Albertson as the only two directors. PTO ¶¶ 25–26; JX 904. The Board has been deadlocked since then.

## II.     LEGAL ANALYSIS

The parties have accused each other of breaching the Transaction Agreements. In its headline claim, Symbiont asserts that Ipreo breached the Non-Competition Provision. Symbiont succeeded in proving that claim.

Ipreo contends that Symbiont breached the Operating Agreement and the JV Agreement by failing to deliver a minimum viable product to the Company. Ipreo failed to prove a breach of the Operating Agreement. Rather than requiring Symbiont to deliver a minimum viable product, the Operating Agreement only provided that Symbiont's cash contribution would be waived if Symbiont delivered a minimum viable product. The parties could have drafted a mandatory delivery obligation, but they did not. Ipreo tried to repackage the same theory as a breach of the JV Agreement, but failed to prove that claim as well.

The parties' other claims involve comparatively minor assertions of breach. All but two of them fail. Each side proved one additional claim, but those claims only support offsetting awards of nominal damages.

Finally, Symbiont attempts to hold Markit liable for Ipreo's breaches under the theory of tortious interference with contract. This decision does not reach that claim.[18]

## A.      Governing Principles Of Contract Law

All of the claims in this case turn on principles of contract law. Delaware law governs the parties' claims.

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs." *WaveDivision Hldgs. v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010). When determining the scope of a contractual obligation, and when measuring the parties' conduct against that obligation to determine breach, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking*

---

[18] Symbiont and Ipreo also invoked the implied covenant of good faith and fair dealing. The implied covenant enables a court to supply fundamental terms addressing unforeseen issues that the parties would have addressed if they had thought to negotiate on the subject. Because the implied covenant supplies implicit terms, it cannot displace explicit terms. *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021). The JV Agreement and other Transaction Agreements address the issues that the parties have presented. "These specific provisions, bargained for and crafted by sophisticated parties, leave no room for the implied covenant." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 20 (Del. Ch. 2009). In addition, Ipreo failed to brief adequately a claim under the implied covenant that it pled in the alternative to its claims for technology-related breaches of Sections 2.2 and 4.1(c) of the JV Agreement. *See* Dkt. 126 ¶¶ 109–110. That implied covenant claim is waived. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

53

*Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotations omitted). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). By contrast, a contract is unambiguous "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation . . . ." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc*, 616 A.2d at 1196.

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). A reading of an agreement must be reasonable when the contract is "read in full and situated in the commercial context between the parties." *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017). "[T]he basic business relationship between the parties must be understood to give sensible life to any contract." *Id.* at 927. But this principle cannot be used to override the plain language of the agreement: "While our courts have recognized that contracts should be 'read in full and situated in the commercial context between the parties,' the background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement." *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018) (quoting *Chi. Bridge*, 166 A.3d at 926–27). "[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted

differently but in fact did not." *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

**B.      Symbiont's Claim For Breach Of The Non-Competition Provision**

In its headline claim, Symbiont asserts that Ipreo breached the Non-Competition Provision. That provision prohibits Ipreo and any of its Affiliates from engaging in the Joint Venture Business except through the Company. JVA § 4.4(a)(i)(x).[19] Symbiont contends that Ipreo breached the Non-Competition Provision as soon as the Acquisition closed because (i) Markit became an Affiliate of Ipreo as a result of the Acquisition, (ii) Markit engaged in the Joint Venture Business by offering its ClearPar product, and (iii) Markit did not run its ClearPar business through the Company. Symbiont proved that Ipreo breached the Non-Competition Provision under this theory.

The only disputed issue for purposes of this claim is whether Markit qualified as an Affiliate of Ipreo after the Acquisition. No one disputes that Markit's ClearPar product fell within the scope of the Joint Venture Business. Everyone agrees that Markit never ran its ClearPar business through the Company.

Whether Markit qualified as an Affiliate of Ipreo turns on the meaning of the Affiliate Definition. Each side proffers its own interpretation of the Affiliate Definition.

---

[19] The provision is reciprocal, so it bound Symbiont as well. The only claim for breach, however, targets Ipreo. For simplicity, therefore, the analysis focuses on Ipreo's obligations under the Non-Competition Provision.

Symbiont argues that the Affiliate Definition calls for determining whether a party qualifies as an Affiliate at the time when contractual compliance with the JV Agreement is measured. For purposes of the Non-Competition Provision, that means determining whether a party qualifies as an Affiliate when the otherwise prohibited competition takes place. Under Symbiont's reading, an entity could qualify as an Affiliate at any point, whether on the effective date of the JV Agreement or thereafter. Once an entity qualified as an Affiliate, the entity could not engage in the Joint Venture Business without causing a breach of the Non-Competition Provision.

Ipreo contends that the Affiliate Definition only encompasses parties that qualified as Affiliates on the date the JV Agreement became effective. For purposes of the Non-Competition Provision, that would mean that the JV Agreement froze the universe of parties that were barred from competing with the Company based on their status on the effective date. Any entity that qualified as an Affiliate after that date could compete freely with the Company without causing a breach of the Non-Competition Provision, even if that entity qualified as an Affiliate.

Under the plain language of the JV Agreement, Symbiont's reading is correct. Ipreo's reading is unreasonable and contrary to the plain language of the JV Agreement. Ipreo consequently breached the Non-Competition Provision as soon as the Acquisition closed and Markit chose not to operate its ClearPar business through the Company.

### 1.    Whether The Non-Competition Provision Binds Markit

As a threshold matter, Ipreo argues at length that the Non-Competition Provision cannot bind a non-party like Markit. *See* DOB 42–51. Ipreo also argues at length that the

Non-Competition Provision does not and cannot require a non-party like Markit to run its competing business through the Company. *See* DOB 48–50. Both propositions are true, and both are irrelevant.

No one disputes that the Non-Competition Provision only binds the parties to the JV Agreement. What matters is that the parties to the JV Agreement agreed unambiguously that none of "their respective Affiliates" would engage in the Joint Venture Business except through the Company. A party can accept contractual consequences for events beyond its control, including the actions of entities that are not parties to the contract. *See, e.g.*, *All. Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.3d 746, 762–63 (Del. Ch. 2009); *see also eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *29–32 (Del. Ch. Sept. 30, 2013). The insurance industry exists because of that basic proposition.

> Justice Holmes explained the relevant concepts a century ago:
>
> An assurance that it shall rain to-morrow, or that a third person shall paint a picture, may as well be a promise as one that the promisee shall receive from some source one hundred bales of cotton, or that the promisor will pay the promisee one hundred dollars. What is the difference in the cases? It is only in the degree of power possessed by the promisor over the event. He has none in the first case. He has equally little legal authority to make a man paint a picture, although he may have larger means of persuasion. He probably will be able to make sure that the promisee has the cotton. Being a rich man, he is certain to be able to pay the one hundred dollars, except in the event of some most improbable accident.
>
> But the law does not inquire, as a general thing, how far the accomplishment of an assurance touching the future is within the power of the promisor. In the moral world it may be that the obligation of a promise is confined to what lies within reach of the will of the promisor (except so far as the limit is unknown on one side, and misrepresented on the other). But unless some consideration of public policy intervenes, I take it that a man may bind himself at law that any future event shall happen. He can therefore promise it in a legal sense. It may be said that when a man covenants that it shall rain

57

to-morrow, or that A shall paint a picture, he only says, in a short form, I will pay if it does not rain, or if A does not paint a picture. But that is not necessarily so. A promise could easily be framed which would be broken by the happening of fair weather, or by A not painting. A promise, then, is simply an accepted assurance that a certain event or state of things shall come to pass.

Oliver Wendell Holmes, Jr., *The Common Law* 298–99 (1881) (footnotes omitted).

The Holmesian principle applies to this case. Through the Non-Competition Provision, Ipreo agreed that if one of its Affiliates engaged in the Joint Venture Business other than through the Company, then Ipreo breached the JV Agreement. It matters not whether Markit is bound by the JV Agreement, nor whether Ipreo had the power to cause Markit to abide by the JV Agreement. If Markit was an Affiliate of Ipreo, and if Markit engaged in the Joint Venture Business other than through the Company, then Ipreo breached the Non-Competition Provision.

### 2.     The Plain Language Of The Affiliate Definition

The Affiliate Definition defines the term "Affiliate" in two steps. It starts with a base definition, then creates an exception for Ipreo's private equity sponsors.

The base definition provides as follows:

> "Affiliate" means, with respect to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with, such Person.

JVA § 1.1 (the "Base Definition"). The Affiliate Definition concludes with the following exception:

> Notwithstanding the foregoing, with respect to Ipreo, Ipreo LTS, Ipreo Holdings or any Ipreo Member, "Affiliate" shall not include the Ipreo Sponsors and any direct or indirect owner thereof, or any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by,

58

or is under common control with, the Ipreo Sponsors (other than Persons directly or indirectly controlled by Ipreo Holdings).

*Id.* (the "Ipreo Sponsors Exception").

Both the Base Definition and the Ipreo Sponsors Exception use the defined term "Person." The JV Agreement defines that term broadly to mean "an individual, corporation, partnership, association, trust, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity." *Id.* § 1.33.

Although this case centers on the role of the Affiliate Definition in the Non-Competition Provision, the Affiliate Definition is not an artifact of that provision. The JV Agreement uses the term in many places.[20] Indeed, it appears in the very first sentence of the JV Agreement as part of the definition of "Ipreo." There, the parties agreed as follows:

> This Joint Venture Agreement (this "Agreement") is made and entered into as of this 11th day of November, 2016, by and between, (i) Ipreo LTS LLC, a Delaware limited liability company ("Ipreo LTS") and a subsidiary of Ipreo Holdings, LLC, a Delaware limited liability company ("Ipreo Holdings" and, together with its Affiliates (as defined below) including Ipreo LTS, "Ipreo"), (ii) Symbiont.io, Inc., a Delaware corporation ("Symbiont"), and [(iii)] solely with respect to Sections 3.1, 4.4 and 4.5, and Article 6, Ipreo Holdings. Ipreo and Symbiont are hereinafter together referred to as the "Parties."

JVA at 1. The context surrounding the first appearance of the term Affiliate makes plain that a principal purpose of the Ipreo Sponsors Exception was to ensure that no one could argue that the Ipreo Sponsors and the entities that they controlled, other than Ipreo Holdings

---

[20] *See* JVA §§ 1.7, 1.20, 1.23, 1.41, 4.2(b)(i), 4.2(d), 4.5, 4.7, 4.9. The term "Affiliates" is also used in the contribution agreement, where its meaning is "as defined in the Joint Venture Agreement." JX 49 §§ 1.1(a)(i), 3.3, 5.5.

and its subsidiaries, fell within the definition of Ipreo or were Parties to the JV Agreement. Absent the Ipreo Sponsors Exclusion, the broad definitions of "Ipreo and its Affiliates" and "Parties" would have swept up the Ipreo Sponsors.

The Ipreo Sponsors Exception has the same function throughout the JV Agreement. It removes the Ipreo Sponsors from the scope of provisions that otherwise would sweep them up within the scope of "Ipreo and its Affiliates." The Ipreo Sponsors Exception does not have any broader or more lasting effect.

### a.     The Time For Determining Affiliate Status

One critical issue that divides the parties is the point in time when a Person's status as an Affiliate is determined for purposes of the Non-Competition Provision. Symbiont argues that the JV Agreement contemplates determining Affiliate status at the time when the otherwise prohibited activity takes place. Ipreo argues that Affiliate status was conclusively determined on the effective date of the JV Agreement.

Symbiont is correct: The plain language of the Affiliate Definition calls for determining a Person's status as an "Affiliate" when contractual compliance is measured. *See eCommerce Indus.*, 2013 WL 5621678, at \*23, \*29–32 (analyzing an acquired subsidiary's "Affiliate" status as of its contested compliance with a non-competition provision executed four years prior). The plain language of the Affiliate Definition does not establish a fixed universe of Affiliates based on their status on the effective date.

### i.     The Plain Language Of The Affiliate Definition

Contractual interpretation begins with plain language. The plain language of the Affiliate Definition starts with the general rule of the Base Definition, which is broad and

60

all-encompassing. It extends to "any" Person who otherwise qualifies, thereby deploying an adjective (any) that encompasses all possible Persons, without restriction. The Base Definition does not contain any language that would limit its scope only to certain Persons at a specific point in time. The Base Definition does not, for example, include a temporal restriction, such as Persons "as of the effective date."

The Affiliate Definition follows the Base Definition with the Ipreo Sponsors Exception, which imposes the only limitation on its scope. The Ipreo Sponsors Exception speaks in terms of specific entities; it too lacks any temporal limitation. It states that it applies "with respect to Ipreo, [Ipreo Sub], Ipreo Holdings or any Ipreo Member," and it specifically carves out the "the Ipreo Sponsors," which is itself a defined term. The general structure of the Affiliate Definition thus starts with a broad and temporally unlimited group of Persons, then excludes only specifically identified Persons. Neither the Base Definition nor the Ipreo Sponsors Exception suggests that a Person's status as an Affiliate is determined at signing and never assessed again.

Next, both the Base Definition and the Ipreo Sponsors Exception deploy the concept of "control." The JV Agreement defines that term as follows:

> For purposes of this Agreement, "control," when used with respect to any specified Person, shall mean
>
> (a)    the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise;
>
> (b)    the ownership, directly or indirectly, of not less than fifty percent (50%) of the then outstanding (i) stock, if the entity is a corporation, or (ii) partnership interests, membership interests, other entity

61

interests or profit interests, if the entity is a partnership, limited liability company or other entity, or

(c)    if the entity is a partnership or limited liability company, control of the general partner or managing member(s); and

the terms "controlling" and "controlled" shall have correlative meanings.

JVA § 1.1 (the "Control Definition") (reformatted).

Like the Base Definition, the Control Definition uses the adjective "any" to frame its scope expansively as extending to "any specified Person." The Control Definition does not contain any language limiting its scope to Persons who exercised control or were under common control with another Person on a particular date. Instead, the Control Definition contains a direct linguistic indication that its tests apply when contractual compliance is measured. The relevant language appears in the test based on equity ownership, which states that control includes "the ownership, directly or indirectly, of not less than fifty percent (50%) of the *then outstanding* (i) stock, if the entity is a corporation, or (ii) partnership interests, membership interests, other entity interests or profit interests, if the entity is a partnership, limited liability company or other entity . . . ." *Id.* § 1.1 (emphasis added). The phrase "then outstanding" recognizes that equity ownership can fluctuate and that the assessment of control must account for the shares outstanding when contractual compliance is measured.

### ii.    The Interaction Between The Affiliate Definition And The Non-Competition Provision

For purposes of the Non-Competition Provision, there are other textual indications that compliance with the Affiliate Definition is determined when contractual compliance

is measured. The Non-Competition Provision is one of a series of restrictive covenants that appears in Section 4.4 of the JV Agreement. The Non-Solicitation Provision prohibits Ipreo, Symbiont, and "their respective Affiliates" from interfering with each other's relationships "with any . . . Customers." JVA § 4.4(a)(i)(z). The JV Agreement defines "Customer" for purposes of the restrictive covenants in Section 4.4 as "(x) any *then current* customer of the Company or the Joint Venture, and (y) any Person that has been a customer of the Company or the Joint Venture at any time within one (1) year prior to *that date*." *Id.* § 4.4(a)(iii) (emphases added). The terms "then current" and "that date" call for Customer status to be determined at the time when contractual compliance is measured. The same is true for the Affiliate Definition.

Another sibling provision in Section 4.4 of the JV Agreement shows that the drafters knew how to tie a restrictive covenant to a state of affairs that existed on a particular date. That sibling restrictive covenant prohibits Ipreo, Symbiont, and "their respective Affiliates" from selling or licensing products or services in competition with "products or services of the Company and the Joint Venture contemplated by the definition of 'Joint Venture Business' *as of the date hereof.*" *Id.* § 4.4(a)(i)(y) (emphasis added). The drafters thus limited the scope of that restrictive covenant to the Company's offerings on the effective date. If the Company later expanded its products or services, then the restrictive covenant would not apply to the new products or services. The Non-Competition Provision does not contain any similar language. Nor does the Affiliate Definition.

63

### iii. Pertinent Case Law

Both sides have identified cases that they rely on to support their interpretation of the Affiliate Definition. Symbiont has identified authority from this court that is directly on point. Ipreo relies on inapposite authorities.

The authority directly on point is this court's decision in *Universal Studios Inc. v. Viacom Inc.*, 705 A.2d 579 (Del. Ch. 1997). Universal and Paramount had formed a joint venture to operate the USA Network. *Id.* at 583. The joint venture agreement contained a non-competition provision which provided that each party "shall not directly or indirectly except through the Venture engage in" the cable television business. *Id.* at 588. The parent entities of each party executed agreements in which they agreed to be bound by the joint venture agreement as if they were parties to it and committed to cause their "Affiliates" to comply with the non-competition provision. *Id.* at 589. The agreement defined the term "Affiliate" as follows:

> "Affiliate" shall mean any corporation or business association which, directly or indirectly, is controlled by, is in control of or is under common control with the the [sic] corporation or business association with reference to which the term "Affiliate" is used. Ownership of 50% of the voting or decisional power with respect to any such corporation or business association shall be deemed control.

*Id.* at 589.

Thirteen years later, Viacom acquired Paramount. Viacom indirectly owned and operated its own cable channels, raising an issue as to whether the non-competition provision applied to Viacom. *Id.* at 585. In the ensuing litigation, this court held that the non-competition provision extended to Viacom as soon as Viacom acquired Paramount.

*Id.* at 589 ("[I]mmediately following Viacom Inc.'s acquisition of Paramount, Viacom International and Paramount were under the common control of Viacom Inc., and as such were affiliates within the definition of the Guarantee."); *id.* at 592 ("On consummation of the merger, Viacom did become an affiliate of Paramount and assumed Paramount's obligations to comply with its covenants relevant here."). The court did not interpret the affiliate definition as only extending to companies that qualified as affiliates when the joint venture agreement was signed.

The *Viacom* decision is persuasive. Markit and Ipreo are like Viacom and Paramount. Markit was not Ipreo's Affiliate when Symbiont and Ipreo executed the JV Agreement, just as Viacom was not Paramount's affiliate when Universal and Paramount executed their joint venture agreement. Markit became Ipreo's Affiliate after Markit acquired Ipreo, just as Viacom became Paramount's affiliate after Viacom acquired Paramount. In *Viacom*, this court held that the non-competition provision in the joint venture agreement encompassed Viacom once it became Paramount's affiliate, and the same is true here. If anything, the Non-Competition Provision presents a clearer case than the provision in *Viacom*, because the plain language of the JV Agreement provides strong textual signals that a Person's status as an Affiliate is determined when contractual compliance is measured.

In addition to basing its analysis on the plain language of the agreements,[21] the *Viacom* court considered what the plain language indicated about the underlying business purpose of the non-competition provision. The court explained that the non-competition provision "can only be read to protect the Venture from competition from its owners and not from competition generally." *Id.* at 591. The obvious purpose behind the non-competition provision was "to promote the USA investment venture by shielding it from the hazards associated with divided loyalties." *Id.* Competition from a parent entity created those hazards, whether or not the competing parent entity had been the parent when the joint venture agreement was executed.

The same is true in this case. Indeed, the parties to the JV Agreement made explicit what the *Viacom* court inferred from plain language. Symbiont and Ipreo agreed that they would be sharing information that they could not readily partition from their other businesses and, accordingly, that the Non-Competition Provision and its sibling restrictive covenants were necessary to protect the Company. The operative language states:

> In connection with the activities of the Joint Venture and the Company, Ipreo LTS, Ipreo Holdings, Symbiont and their respective Affiliates will have access to proprietary, confidential and other nonpublic information (including trade secrets, know-how, customer lists and employee identities) relating to aspects of each Party's business that will not be conducted through the Company and the Joint Venture. Because such information cannot be separated from the information relevant to the Joint Venture Business that will be conducted through the Company and the Joint Venture, Ipreo LTS,

---

[21] New York law governed the joint venture agreement in *Viacom*. *See* 705 A.2d at 589. Nothing about that specification suggests that the court would have reached a different result under Delaware law. The court gave the language of the agreement "its plain and ordinary meaning" and enforced the "plain and unambiguous" terms of the agreement. *Id.*

> Ipreo Holdings and Symbiont hereby agree as follows in exchange for access to the business system and information[.]

JVA § 4.4. As in *Viacom*, the parties sought to protect the Company against competition from Affiliates. It did not matter whether the Person was an Affiliate at signing or gained that status later.

Lawyers draft in the shadow of existing precedent. A major benefit of precedent is to clarify the meaning of contractual terms so that parties can deploy them with confidence. When Symbiont and Ipreo entered into the JV Agreement in 2016, the *Viacom* case was settled precedent. It had been on the books for nineteen years. The decision not only illuminates the plain language of the JV Agreement, but it also shows that if the drafters wanted to achieve a different result, such as limiting the coverage of the Affiliate Definition to those Persons that qualified as affiliates on the effective date, then they needed to include additional language to achieve that result.

To reach a contrary conclusion, Ipreo argues that the fact that the parties drafted the Affiliate Definition "in the present tense" and "without any forward-looking terms or references to future entities" proves that the parties intended to limit Ipreo's Affiliates to those in existence "at signing." DOB 43. Ipreo infers that the Affiliate Definition therefore only applies to "a Person who . . . controls, is controlled by, or is under common control with, such Person" on the effective date of the JV Agreement. *Id.* But that is not why the Affiliate Definition uses the present tense. The Affiliate Definition uses that tense because the question is whether an entity "controls, is controlled by, or is under common control with, such Person" at the point in time when contractual compliance is measured. When

the Affiliate Definition is read as a whole, the plain language demonstrates that it uses the present tense to ask whether a Person is an Affiliate at the time of the alleged breach.

To support its argument, Ipreo relies on two Delaware decisions: *Ashland LLC v. Samuel J. Heyman 1981 Continuing Trust for Heyman*, 2017 WL 1224506 (Del. Super. Mar. 30, 2017), and *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455 (Del. Ch. Dec. 30, 2010). Both interpreted indemnification provisions that expressly included forward-looking language that encompassed future affiliates. Both decisions enforced that language. Neither decision addressed what would happen without the forward-looking language. Neither case establishes a mandatory rule of interpretation that using the present tense when defining affiliates freezes the universe of affiliates to those that qualify when the agreement is executed.

The complex facts of *Ashland* centered on a dispute over who would bear environmental liabilities associated with the "Linden Property." 2017 WL 1224506, at *1. In 2011, the owners of International Specialty Products, Inc. ("ISP") sold all of its stock to Ashland LLC. Through a stack of subsidiaries, ISP owned the Linden Property. As part of the sale of ISP to Ashland, ISP created a new subsidiary (LPH), transferred the Linden Property to LPH, then transferred ownership of LPH back to the sellers. LPH was thus briefly an affiliate of Ashland, but promptly ended up on the sell-side of the deal.

When government regulators ordered a clean-up of the Linden Property, the sellers tried to shift the environmental liabilities to Ashland. One of their arguments invoked an indemnification agreement entered into fifteen years earlier between ISP and its former parent (GAF) as part of the spinoff of ISP from GAF. *Id.* at *9. The indemnification

68

agreement sought to allocate pre-spinoff liabilities to GAF and post-spinoff liabilities to ISP. It therefore contained a provision in which ISP agreed to indemnify GAF "and each of their respective Representatives and Affiliates" against post-spinoff liabilities associated with ISP. *Id.* LPH claimed it was an intended third-party beneficiary of this provision and attempted to invoke it to force Ashland, the new owner of ISP, to bear the environmental liabilities. The court rejected this argument, noting that there was "no future-looking language" in the provision that would have suggested that ISP agreed in 1996 to indemnify an entity that did not exist until 2011. The court also noted that in a second indemnification provision, GAF had agreed to indemnify ISP, "its Post Spin Subsidiaries and each of their respective *present and future* Representatives and Affiliates" against liabilities associated with GAF. *Id.* (emphasis added). The obvious contrast between the two provisions indicated that ISP had not committed to indemnify an affiliate that was created fifteen years later. The court rejected LPH's claim of third-party beneficiary status, finding it was "too distant from the Indemnification Agreement's formation and operation." *Id.*

The *Ashland* case is readily distinguishable. The case involved competing indemnification provisions in which one referred explicitly to "present and future" affiliates and the other did not. The case also involved LPH attempting to invoke an indemnification provision in a context that did not make sense. The indemnification agreement sought to allocate liability between a parent (GAF) and its spun-off subsidiary (ISP). LPH only could claim to be GAF's affiliate because it was briefly an affiliate of ISP fifteen years later. LPH then sought to use the indemnification agreement to assert a claim against ISP, even though LPH came into existence on the ISP side of the GAF-ISP divide.

69

The *Ashland* court understandably rejected LPH's attempt to use the indemnification agreement for an inapposite purpose. The decision reached a sensible result based on an obvious difference in the contractual language of the two provisions. The decision did not establish a general rule that the failure to use future-looking language in an affiliate definition means that the provision only extends to affiliates at the time of contracting.

The *MicroStrategy* decision is similar. The owner of several patents (ARC) had sued MicroStrategy in federal court. The parties settled, and ARC and its parent entity granted MicroStrategy a broad release "on behalf of themselves and their Affiliates." 2010 WL 5550455, at *2. The release covered any claims that ARC had asserted or could have asserted in the federal action, plus any claims related to the patents in question. ARC and its parent also represented and warranted that ARC "and its Affiliates" had "no present plan or intent" to sue MicroStrategy on any other patent "owned, licensed, or controlled by [ARC] or any of its Affiliates as of the Effective Date." *Id.*

When it entered into the settlement agreement, ARC was in the process of acquiring another patent, and shortly after the settlement agreement became effective, ARC formed a new subsidiary (DAS) that asserted a claim against MicroStrategy to enforce the acquired patent. *Id.* at *3. MicroStrategy responded by suing ARC and DAS for breach of the settlement agreement, including breach of the representation about ARC and its "Affiliates" not having any present plan or intent to sue.

In response, DAS argued that it could not have breached the settlement agreement because ARC had not formed it until after the effective date. The court held that under the

70

definition of "Affiliate," ARC bound DAS to the settlement agreement, such that MicroStrategy could assert a claim for breach against DAS. *Id.* at \*12. The court noted that the settlement agreement defined "affiliate" to include "any entity which either party [*i.e.*, ARC] *now or hereafter*, directly or indirectly, owns or controls . . . ." *Id.* (alteration original) (emphasis added). The court reasoned as follows:

> The phrase "now or hereafter" in that section unambiguously contemplates that the Agreement would apply to later acquired or formed entities owned or controlled by the parties to the Agreement. Because DAS is concededly a wholly-owned subsidiary of ARC and, as such, an Affiliate of ARC under § 1.2, DAS is bound by § 5.2(ii) to the same extent as ARC, even if it was not formed until after the Effective Date.

*Id.* The court thus enforced the plain language of the agreement.

Because the *MicroStrategy* provision contained express language, the court did not have to consider whether the affiliate definition would have applied if it had not contained the phrase "now or hereafter." The court did not need to consider, for example, the implications of a definition of affiliate that extended to "any entity which either party owns or controls, directly or indirectly." Like the *Ashland* case, the *MicroStrategy* decision shows that a Delaware court will not hesitate to enforce express language. Neither case establishes a general rule that the failure to use future-looking language in an affiliate definition means that the provision only extends to affiliates at the time of contracting.

Ipreo's final authority is *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239 (2014). That decision interpreted an agreement from 1961 between Duke Ellington and certain music publishers. Ellington assigned the copyrights to his music to the publishers in return for 50% of the "net revenue actually received" by the publishers from foreign publication. *Id.*

71

at 242. The agreement bound the named publishers, "their predecessors in interest, and any other affiliate." *Id.* When the agreement was executed, the publishers contracted with unaffiliated companies for foreign publication. By 1994, the named publishers had acquired foreign sub-publishers. The named publishers and their foreign affiliates split the foreign revenues equally, then the named publishers paid Ellington 50% of what they received from their affiliates. *Id.* at 243. Ellington sued, claiming he should receive 50% of the total net revenue that the foreign sub-publishers received.[22]

The New York Court of Appeals affirmed the dismissal of the complaint. In a majority opinion issued by four of the court's seven justices, the court held that the plain language of the contract did not give Ellington a right to the foreign affiliates revenue. First, the court held that "net revenue actually received" meant net revenue received by the publishers, not their foreign affiliates. The court stressed that the royalty provision plainly contemplated that the foreign sub-publishers could be compensated, did not limit how much they could receive, and made "no distinction between affiliated and unaffiliated foreign subpublishers." *Id.* at 245.

Second, the court held that the description of the parties as the named publishers, "their predecessors in interest, and any other affiliate" did not change this result.

----

[22] Ellington, whom some considered "America's most important composer," died in 1974. *See* John S. Wilson, *Duke Ellington, a Master of Music, Dies at 75*, N.Y. Times, May 25, 1974, at 1, 36, https://timesmachine.nytimes.com/timesmachine/1974/05/25/issue.html. Ellington's heirs sought to enforce his interests under the agreement. *Ellington*, 24 N.Y.3d at 242.

Articulating the principle that Ipreo asks this court to embrace, the New York Court of Appeals stated that "[a]bsent explicit language demonstrating the parties' intent to bind future affiliates of the contracting parties, the term 'affiliate' includes only those affiliates in existence at the time that the contract was executed." *Id.* at 246. Relying on the grammatical principle that Ipreo champions, the court stated that "the use of present tense language in the Agreement also demonstrates that the parties intended that the Agreement would bind only affiliates in existence at the time of the Agreement." *Id.* at 247.

In my view, the court went too far by articulating these expansive principles, ostensibly based solely on grammar. It rather seems to me that the majority opinion considered the agreement as a whole and interpreted the terse reference to "affiliate" in the context of the entire agreement. In an opinion that concurred in the result but not the reasoning, Justice Smith disagreed with the majority's grammar-based reductionism while explaining how the agreement as a whole supported the result:

> I agree with the majority's result, but not its reasoning. As a general proposition, it seems wrong to me that, when a contract is written to bind "any . . . affiliate" of a party, its effect should be limited to affiliates in existence at the time of contracting. That invites parties to create new affiliates, and to have them do what the old affiliates are prohibited by the contract from doing.
>
> Nor does the Agreement's use of the present tense in referring to EMI's affiliates suggest to me that later-created affiliates were to be outside its scope. If I say "I have three grandchildren" I am making a statement of fact; I am not restricting the definition of "grandchild" so as to exclude any who might later be born.
>
> Indeed, if the facts of this case were a bit different, I very much doubt that the majority would give "affiliate" such a restrictive reading. Suppose that EMI had created new affiliates and arranged for them to receive not the 50% of royalties that unaffiliated foreign subpublishers had previously received,

but 90%. If the new affiliates had no obligation to the Ellington family under the agreement, the family's share would be reduced to 5%—obviously contrary to what the parties intended.

What persuades me nevertheless to concur in the result here is the parties' practical construction of the Agreement. For many years before this litigation began, EMI provided semiannual royalty statements to the Ellington estate, and later to plaintiff individually, which clearly disclosed that affiliated subpublishers were getting the same 50% of foreign royalties that unaffiliated ones previously got. These disclosures go back at least to 1994, and plaintiff personally received them beginning in 2002. The record discloses no complaint by anyone about the split until September of 2008, and plaintiff offers no explanation for his and his predecessor's many years of acquiescence. This persuades me that the parties always understood that 50% of foreign royalties could be paid to foreign subpublishers—affiliated or not—before plaintiff's share of the royalties was computed.

*Id.* at 248. Two other justices dissented from the majority opinion in its entirety, believing that the use of "affiliate" rendered the language ambiguous. *Id.* at 250, 253.

Delaware law uses grammatical rules and punctuation as "useful signposts" to help a court determine plain meaning. *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 n.230 (Del. Ch. Jan. 31, 2017). Our cases do not articulate rules of law based on grammatical niceties. "[G]rammar and punctuation are of secondary importance to a court in interpreting a contract where such grammar and punctuation reasonably would frustrate the parties' clear intent as evinced from the language used in the contract." *MicroStrategy*, 2010 WL 5550455, at *7. A court applying Delaware law "will not allow the imprecise placement of adverbs and commas to alter the otherwise plain meaning of a contractual provision or to frustrate the overall plan or scheme memorialized in the parties' contract." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 556 (Del. Super.), *aff'd*, 886 A.2d 1278 (Del. 2005) (ORDER); *see* 17A Am. Jur. 2d Contracts § 358, Westlaw (database

updated August 2021) ("While a court, in construing a contract, will give due force to the grammatical arrangement of the clauses, it will disregard the grammatical construction if it is at variance with the intent of the parties as indicated by the contract as a whole.").

The same is true for the use of tense, which should not trump the plain language of an agreement when read as a whole. To the extent the *EMI Music* decision announced a rule of law grounded solely in the use of the present tense, it is not persuasive authority for the interpretation of the plain language of an agreement under Delaware law.[23]

### b. The Scope Of The Ipreo Sponsors Exception

A second critical issue that divides the parties is the scope of the Ipreo Sponsors Exception. This decision has found that the plain language of the Affiliate Definition calls for determining a Person's status as an Affiliate when contractual compliance is measured. Consistent with that interpretation, Symbiont argues for testing the Person's status under the Ipreo Sponsors Exception when contractual compliance is measured. Ipreo envisions a different approach in which any Person that did not qualify as an Affiliate when the contract was executed could transfer its exempt status to its successors and assigns, creating

---

[23] If one wanted to debate the implications of tense, then there would be much more to say, and many grammatical sources to consult. For example, as a general matter, drafters of statutes, bylaws, and other documents that establish obligations recommend using the present tense. *See* Richard C. Wydick, *Plain English For Lawyers* 62 (5th ed. 2005). A statute that uses the present tense does not only regulate those persons who happen to be engaged in the activity when the statute was enacted. That proposition alone should be sufficient to cast doubt on the approach taken in *EMI Music.* Nor does the present tense invariably convey the same meaning. For example, there are circumstances in English when the present tense is used for future action, as in "the train arrives this afternoon." The better rule is that tense is not dispositive. Context matters.

perpetual and malleable exceptions to the Affiliate Definition. Once again, Symbiont's reading is correct. Under the plain language of the Base Definition, Markit became an Affiliate of Ipreo as soon as the Acquisition closed. The Ipreo Sponsors Exception does not change that result.

### i.      The Plain Language Of The Ipreo Sponsors Exception

To repeat, the Ipreo Sponsors Exception provides that notwithstanding the broad scope of the Base Definition,

> with respect to Ipreo, Ipreo LTS, Ipreo Holdings or any Ipreo Member, "Affiliate" shall not include the Ipreo Sponsors and any direct or indirect owner thereof, or any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Ipreo Sponsors (other than Persons directly or indirectly controlled by Ipreo Holdings).

JVA § 1.1. The plain language of the Ipreo Sponsors Exception thus focuses on "the Ipreo Sponsors" and provides that the Affiliate Definition "shall not include" them. It then expands the carveout for the Ipreo Sponsors to encompass two additional categories of Persons: (i) "any direct or indirect owner thereof [i.e., any owner of the Ipreo Sponsors]" and (ii) "any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Ipreo Sponsors." *Id.*

The plain language of the Ipreo Sponsors Exception then finishes with an exclusion. If a Person otherwise would qualify as a non-Affiliate under the Ipreo Sponsors Exception, then the Person nevertheless is excluded and qualifies as an Affiliate if the Person is "directly or indirectly controlled by Ipreo Holdings." The final exclusion is an example of belt-and-suspenders drafting because the definition of Ipreo Sponsors itself excludes those

76

entities. That definition states that "'Ipreo Sponsors' means The Blackstone Group L.P., The Goldman Sachs Group, Inc. and their respective Affiliates (other than Persons directly or indirectly controlled by Ipreo Holdings)." *Id.* § 1.20.

The plain language of the Ipreo Sponsors Exception calls for subjecting a Person who qualifies as an Affiliate under the Base Definition to a series of inquiries to determine whether that person is no longer an Affiliate under the Ipreo Sponsors Exception. For the reasons already discussed, the time for measuring whether the Person falls within the Ipreo Sponsors Exception is the point when contractual compliance is measured.

Although this decision has explained why tense is not dispositive, a devotee of tense would find within the Ipreo Sponsors Exception a textual hint that the exception is forward-looking: The Ipreo Sponsors Exception uses the future tense verbal phrase "shall not include," rather than the present tense "does not include." In the law, the auxiliary verb "shall" often denotes something mandatory (here, a mandatory exclusion), but it is also a standard form of the future tense in English. The two senses overlap, because something that invariably will happen is mandatory. This decision declines to fetishize the tense of the Ipreo Sponsors Exception any more than the Base Definition. It is the language of the Affiliate Definition when read as part of the JV Agreement as a whole that calls for determining a Person's status as an Affiliate when contractual compliance is measured.

Accordingly, the first inquiry under the plain language of the Ipreo Sponsors Exception is whether, at the time for measuring contractual compliance, the Person that otherwise qualifies as an Affiliate is one of the Ipreo Sponsors. Markit was not one of the

77

Ipreo Sponsors when it competed with the Company, so this aspect of the Ipreo Sponsors Exception does not apply.

The second inquiry under the Ipreo Sponsors Exception is whether, at the time for measuring contractual compliance, the Person that otherwise qualifies as an Affiliate is a direct or indirect owner of one of the Ipreo Sponsors. Markit was not a direct or indirect owner of one of the Ipreo Sponsors when it competed with the Company, so this aspect of the Ipreo Sponsors Exception does not apply either.

The third inquiry under the Ipreo Sponsors Exception is whether, at the time for measuring contractual compliance, the Person that otherwise qualifies as an Affiliate is a "Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Ipreo Sponsors." Again, Markit was not, so this aspect of the Ipreo Sponsors Exception does not apply either.

The final clause in the Ipreo Sponsors Exception creates an exclusion from the exception. The exclusion recognizes that even if a Person falls within the Ipreo Sponsors Exception, then the Ipreo Sponsors Exception nevertheless will *not* apply and the Person *will* qualify as an Affiliate if the Person is "directly or indirectly controlled by Ipreo Holdings." Markit does not otherwise fall within the Ipreo Sponsors Exception, so the exclusion is irrelevant.

Under the Base Definition, Markit became an Affiliate once the Acquisition closed. The Ipreo Sponsors Exclusion does not apply to Markit. Therefore, Markit was an Affiliate of Ipreo for purposes of the Non-Competition Provision.

78

### ii. Ipreo's Unreasonable Interpretation Of The Ipreo Sponsors Exception

Ipreo reads the Ipreo Sponsors Exception as limiting Ipreo's Affiliates for purposes of the JV Agreement "to Ipreo Holdings and Ipreo entities below it in the corporate ownership structure at signing." DOB 43. Under Ipreo's reading, because the JV Agreement established the universe of Ipreo's Affiliates at signing, those determinations persisted for all time. Put differently, for the Ipreo side, the Non-Competition Provision always bound only Ipreo Holdings and its subsidiaries. Ipreo concludes that when Markit acquired Ipreo Holdings, it did not become an Affiliate of Ipreo and accordingly could compete freely without causing Ipreo to violate the Non-Competition Provision.

In the primary version of this argument, Ipreo relies on the theory that the Affiliate Definition established a fixed division at signing between Persons who were Affiliates and Persons who were not Affiliates. For the reasons already discussed, that is not a reasonable reading of the Affiliate Definition. Rather, the language of that provision calls for determining whether a Person qualifies as an Affiliate at the time for measuring contractual compliance.

In a secondary version of this argument, Ipreo perceives significance in the fact that the JV Agreement lacks a successors and assigns clause. Ipreo claims that without such a clause, the court should infer that the Non-Competition Provision does not bind future acquirers of Ipreo. DOB 43. That argument suggests confusion about how the Non-Competition Provision works. The Non-Competition Provision binds Ipreo as a party to the JV Agreement. The Non-Competition Provision provides that *Ipreo* breaches the JV

79

Agreement if a Person who qualifies as one of its Affiliates engages in the Joint Venture Business outside of the Company. There is no question about the Non-Competition Provision binding or not binding Markit as a successor or assign of a party to the JV Agreement.

Nor does Ipreo's successors-and-assigns argument withstand closer scrutiny. Ipreo calls attention to the successors-and-assigns provision in the Operating Agreement, which contains customary language for such a provision. It states:

> Successors and Assigns. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

OA § 12.08. But that provision, even if present, would not apply to the Ipreo Sponsors as beneficiaries of the Ipreo Sponsors Exception, because it only applies to "*the parties hereto and their respective heirs, executors, administrators, successors and assigns.*" *Id.* (emphasis added). The Ipreo Sponsors are not parties to the JV Agreement. The principal function of the Ipreo Sponsors Exception is to prevent them from being parties to the JV Agreement.

Rather than supporting Ipreo's argument, the absence of a successors-and-assigns provision, and the fact that the standard language for such a clause only applies to parties, reinforce the plain language of the Ipreo Sponsors Exception. That language only protects the Ipreo Sponsors and parties they control (other than Ipreo itself).

In the most concrete version of its argument, Ipreo observes that Infinity Intermediate Holdings LLC ("Infinity"), the entity that owned Ipreo Holdings, did not qualify as an Affiliate when it was under the control of the Ipreo Sponsors. That is true,

and the Ipreo Sponsors Exception generates that result. Ipreo then argues, however, that when Infinity merged with a Markit subsidiary to effectuate the Acquisition, Infinity retained its non-Affiliate status. *See* DOB 45–46. That is not true, and the Ipreo Sponsors Exception again generates that result.

Before the Acquisition, Infinity fell within the Base Definition, but it was under the control of the Ipreo Sponsors and also was not under the control of Ipreo Holdings. Infinity therefore fell within the Ipreo Sponsors Exception and was not an Affiliate of Ipreo. After the Acquisition, Infinity fell within the Base Definition and was no longer under the control of the Ipreo Sponsors. It therefore no longer fell within the Ipreo Sponsors Exception, and it qualified as an Affiliate.

At bottom, Ipreo's reading of the Ipreo Sponsors Exception fails because it treats an exclusion from the exception as if it were the entirety of the provision. Ipreo elevates the importance of the final nine words of the Ipreo Sponsors Exception: "only Persons directly or indirectly controlled by Ipreo Holdings." Based on this language, Ipreo argues that on the Ipreo side, the Affiliate Definition only encompassed Ipreo Holdings and its subsidiaries.

Ipreo's reading ignores the other fifty-five words of the Ipreo Sponsors Exception, rendering them surplusage. All of those words focus on the Ipreo Sponsors and tie the scope of the Ipreo Sponsors Exception to entities having a relationship to the Ipreo Sponsors. Ipreo's reading ignores that connection. Ipreo's reading also ignores the twenty-six words of the Base Definition. Under Ipreo's reading, all of that language becomes surplusage.

81

If the drafters of the JV Agreement had wanted to achieve the result that Ipreo seeks, then they had a much easier method available. They simply could have said:

> Notwithstanding the foregoing, with respect to Ipreo, Ipreo LTS, Ipreo Holdings or any Ipreo Member, "Affiliate" shall mean only Persons directly or indirectly controlled by Ipreo Holdings.

Of course, the drafters did not say that. They instead drafted the Ipreo Sponsors Exception to turn on the involvement of the Ipreo Sponsors or entities controlled by the Ipreo Sponsors, with an exclusion for "Persons directly or indirectly controlled by Ipreo Holdings." Ipreo's argument guts the Affiliate Definition, including the Ipreo Sponsors Exception.

### c.      The Real-World Commercial Context

For purposes of this case, the Affiliate Definition operates within the Non-Competition Provision, and both must be read together. As noted, a reading of an agreement must be reasonable when the contract is "read in full and situated in the commercial context between the parties." *Chi. Bridge*, 166 A.3d at 926–27.

To repeat, the Non-Competition Provision states:

> [N]one of Ipreo LTS, Ipreo Holdings, Symbiont nor their respective Affiliates shall, without the prior written consent of the other,

> (i)      during the period that it or its Affiliates holds a ten (10) percent or greater direct or indirect ownership interest in the Company, and

> (ii)     (A) for one (1) year thereafter, or (B) in the event that during such period the Company ceases to engage in the Joint Venture Business, then for one (1) year thereafter;

> directly or indirectly, on its own behalf or on behalf of another Person:

> . . . own, manage, operate, jointly control, finance or participate in the ownership, management, operation, control or financing of, or be connected

as a partner, principal, manager, agent, representative, consultant, advisor, promoter or otherwise assist (financially or otherwise) with or participate in, or use or permit its name or the name of any of its Affiliates to be used in connection with, any business or enterprise that is engaged in the Joint Venture Business anywhere in the world (the "Territory") except through the Company and the Joint Venture . . . .

JVA § 4.4(a)(i)(x) (reformatted).

When read as part of the Non-Competition Provision and evaluated in its commercial context, the plain language of the Affiliate Definition makes sense. The parties were entering into an ongoing venture that could last years. Ownership necessarily could change during this period, and they accordingly included language in the Non-Competition Provision that tied its obligations to "the period that [a party] or its Affiliates holds a ten (10) percent or greater direct or indirect ownership interest in the Company." They further agreed the Non-Competition Provision would apply for a period of one year *after* a qualifying person fell below the ownership threshold. The Non-Competition Provision did not contemplate a determination of Affiliate status at signing that would never change after that date. The provision looked forward from signing across a multi-year future.

Reading the plain language of the Affiliate Definition to call for determining a Person's status as an Affiliate when contractual compliance is measured comports with the plain language of the Non-Competition Provision. It would not make sense for the Non-Competition Provision to acknowledge that the members' relationships with the Company could change over time, yet for the Affiliate Definition to treat those relationships as forever fixed at the time of signing.

83

When evaluated in the light of the Non-Competition Provision and the commercial context, Ipreo's interpretation of the Affiliate Definition produces "an absurd result" that "no reasonable person would have accepted when entering the contract." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010). Under Ipreo's reading, either Symbiont or Ipreo could form a new entity immediately after executing the JV Agreement, then conduct Joint Venture Business through that entity. That outcome is absurd, but it necessarily follows from the premise that Affiliate status is forever fixed at signing. For the Affiliate Definition to pick up a post-signing Affiliate, the definition must apply at the time contractual compliance is measured, which Ipreo insists is not the case. No reasonable person would have accepted a non-competition provision that a counterparty immediately could circumvent by creating an entity that did not exist at signing. The Non-Competition Provision would have no teeth, because the parties could compete with the Company without restriction.[24]

Ipreo attempts to respond to this real-world consequence with purported real-world context of their own. Ipreo observes that when negotiating the Transaction Agreements, the parties marked up the sections of the Operating Agreement that governed the ability of members to transfer their interests in the Company. When explaining its comments, Ipreo's

---

[24] During oral argument, Ipreo tried to suggest that the Affiliate Definition would cover a newly created subsidiary, because the new entity would be controlled by Ipreo Holdings and thus fall within the exclusion to the Ipreo Sponsors Exception. *See* Dkt. 225 at 69–71. But for that reasoning to work, the Affiliate Definition and the Ipreo Sponsors Exception must call for determining Affiliate status when contractual compliance is measured, which is the proposition that Ipreo rejects.

84

lawyers told Symbiont that Ipreo could not be subject to any limitations on its ability to engage in a change of control. Ipreo asserts that its lawyers took this position because the Ipreo Sponsors anticipated exiting from their investment in Ipreo and wanted to maximize the price they could receive in a sale. Ipreo then reasons that the Ipreo Sponsors never would have agreed to a version of the Non-Competition Provision that an acquisition might trigger, because the risk of triggering the Non-Competition Provision would cause the acquirer to reduce the amount that it would pay for Ipreo. The defendants argue that the Ipreo Sponsors never would have accepted that, and so the Non-Competition Provision and the Affiliate Definition cannot mean what they say.

The record evidence does not support this theory. During the negotiations over the Transaction Agreements, the parties only discussed a potential sale of Ipreo on one occasion, and that was in the context of the transfer restrictions that appear in Article IX of the Operating Agreement. As is typical in a closely held entity, the Operating Agreement establishes a default rule prohibiting the transfer of member interests, then creates various exceptions where transfers are permitted.

In an early draft, Ipreo proposed a one-sided definition of a "Change of Control" in which a sale of Symbiont—but not a sale of Ipreo—would qualify as a "Transfer" of member interests in the Company and hence be prohibited. *See* JX 26 at '184, '213–14. Ipreo thus sought a unilateral restriction on Symbiont's freedom to engage in a change in control. Symbiont understandably rejected that proposal and countered by making the definition of Change of Control reciprocal. But Symbiont did not go as far as Ipreo by targeting all changes of control. Under Symbiont's counter, only a sale to a "Competitor

85

of either the Ipreo Member or the Symbiont Member" would constitute a prohibited transfer of a member's interest in the Company under Article IX of the Operating Agreement. JX 27 at '541, '569–70. Ipreo rejected that approach, telling Symbiont that "Ipreo cannot be subject to any restrictions regarding a Change of Control transaction." JX 28 at '090. The parties resolved the dispute by taking the change-of-control issue off the table. The final Operating Agreement prohibits Symbiont and Ipreo Sub from Transferring their membership interests "to a Competitor" and states, "[i]t is expressly agreed that a Change of Control shall not constitute a Transfer subject to the restrictions of this Article IX." OA §§ 9.01(a), 9.01(b)(viii).

Based on this exchange concerning the transfer provisions in the Operating Agreement, the defendants draw inferences about the scope of the Non-Competition Provision in the JV Agreement. But the parties were aligned at all times on the scope of the Non-Competition Provision. The original term sheet that Ipreo prepared and sent to Symbiont included the deal point that would become the Non-Competition Provision, stating that "the Parties agree to refrain from competing with Newco products and services as defined in this Term Sheet." JX 13 at '429. In their first reactions to the proposed joint venture, the Ipreo Sponsors supported both the concept of the Joint Venture and the idea of a non-competition provision. *See* JX 17 at '744 (Ipreo Sponsors asking how to guarantee Symbiont prioritizes the Joint Venture and citing the possibility of "a non-compete or exclusivity"). Ipreo had a particular interest in a broad non-competition provision because Ipreo wanted Symbiont's Smart Loan business to be part of the Joint Venture and subject to the restriction. *See* JX 22.

86

The initial draft of the JV Agreement that Ipreo's counsel prepared and sent to Symbiont included both the Affiliate Definition and the Non-Competition Provision in what was substantively their final form. *See* JX 18 at '371–72, '380–81. After Ipreo tried to use the transfer restrictions in the Operating Agreement to limit Symbiont's freedom to engage in a Change of Control, and after Ipreo pushed back on Symbiont's attempt to make the limitation mutual, Symbiont explained that its business concern was that "neither party should be allowed to transfer [its interest in the Company] to a competitor." JX 30 at '098. The parties' revisions to the definition of "Change of Control" and Article IX resolved their disagreement over the transfer restrictions. No one proposed or made any corresponding changes to the Affiliate Definition or the Non-Competition Provision.

There are no contemporaneous documents suggesting that the Ipreo Sponsors or Ipreo thought that keeping the Non-Competition Provision in its original form would have any effect on their ability to sell Ipreo. That was not because of a contrived interpretation of the Ipreo Sponsors Exception, but rather because the Ipreo Sponsors had full control over whether to include Ipreo's interest in the Company in any sale of Ipreo.

In the aggregate, Ipreo was a multi-billion-dollar business. Unless the Company quickly achieved outsized success, the Company was unlikely to move the needle on Ipreo's valuation. If the Ipreo Sponsors wanted to sell Ipreo, then they simply could carve out the Company and sell the rest. In that event, the Non-Competition Provision would have no effect on the Ipreo Sponsors' ability to achieve maximum value for the remainder of Ipreo's business.

87

From the Ipreo Sponsors' standpoint, a joint venture with Symbiont that was protected by the Non-Competition Provision created upside and no downside. If the Company became valuable, and if a buyer of Ipreo would pay for that value, then the Ipreo Sponsors could include Ipreo's interest in the sale. If the Company did not become valuable, or if a buyer of Ipreo would not pay for that value (whether due to the Non-Competition Provision or otherwise), then the Ipreo Sponsors could transfer Ipreo's interest in the Company to an affiliate and keep it.

Rather than contemporaneous evidence, Ipreo relies on testimony from Marcus. He claimed at trial that during the negotiations over the Joint Venture, Smith "wanted to build in some kind of protections" out of "concern[] about the possibility of us eventually exiting or selling our business to IHS Markit, which was the main competitor to what we were trying to create with the joint venture." Marcus Tr. 492. Marcus asserted at trial that in "mid/late 2016," he pulled Smith "aside" during a meeting and told him "in no uncertain terms that there were certain things that were open for negotiation in this kind of agreement; that issue wasn't one of them." *Id.* at 493. Retrospectively anticipating the Ipreo Sponsors issue, Marcus claimed that he told Smith that "our sponsors would never accept any kind of, in a sense, disadvantaging of IHS Markit in any kind of future process that might arise," and that Albertson later told him that Smith "gave in on" the point. *Id.* at 494, 496.

Marcus did not testify credibly on this subject. Smith, the other supposed party to the conversation, testified that it never took place. Smith Tr. 26–27. Albertson, who ostensibly told Marcus that Smith had conceded the deal point, testified both in deposition and at trial that he could not recall Marcus ever being involved in the negotiations over the

88

JV Agreement. Albertson Tr. 994. Albertson also could not recall any internal discussions at Ipreo concerning the Affiliate Definition or the Non-Competition Provision. Albertson Tr. 993–96; Albertson Dep. 40, 51. That testimony is consistent with the contemporaneous documents, which do not show any changes in the Affiliate Definition or the Non-Competition Provision and reflect only an exchange between lawyers over the transfer restrictions in the Operating Agreement. Albertson, not Marcus, served as Ipreo's Rule 30(b)(6) witness on the negotiation of the Transaction Agreements. JX 621.

Salerno, a uniformly credible witness whom Diogenes would have embraced, could not recall any conversation in which Smith voiced concern about needing protection against a sale to Markit. Salerno Tr. 723–24. It was Salerno who principally negotiated with Smith over the terms of the Joint Venture.

The testimony Marcus gave at trial on this issue departed materially from his deposition, taken just three months before, when he failed to recall anything about the alleged conversation. Instead, Marcus testified in his deposition that when the Acquisition was announced, Ipreo had not yet finalized its position on whether Markit's ownership of Ipreo would create an issue under the Non-Competition Provision. Marcus Dep. 256–58. During the deposition, counsel questioned Marcus about a conversation with Smith that took place *after* the Acquisition and asked whether Marcus had reminded Smith of any discussions that took place during the negotiations over the Joint Venture. *Id.* Marcus could not recall doing that. *Id.* Yet at trial, Marcus claimed that he referred Smith back to the earlier conversation that Marcus had come to recall in vivid detail. Marcus Tr. 524–25.

89

Marcus's trial testimony also differed from his deposition testimony regarding other conversations. During his deposition, Marcus described a conversation in which Salerno asserted that the Acquisition would trigger the Non-Competition Provision if it closed. Marcus testified that he "simply listened" to Salerno and "didn't comment at all." Marcus Dep. 225–26. At trial, Marcus claimed that he disagreed with Salerno and told him that the issue had been raised and "closed off as a nonissue in the JV Agreement." Marcus Tr. 519–21. Salerno testified twice that the conversation that Marcus remembered at trial never happened. Salerno Tr. 733–34, 745–46. Marcus also changed his story about a conversation with Adam Kansler, a Markit executive, on this issue. *Compare* Marcus Dep. 222–23, *with* Marcus Tr. 525–26.

Contrary to Marcus's claim at trial that Ipreo viewed the implications of the Acquisition as settled, the contemporaneous evidence shows that Ipreo did not have an established position. *See* JX 395; JX 421. And there is no evidence that anyone from Ipreo informed Markit that the issue was settled, even though Markit asked a due diligence question specifically directed to whether the Acquisition would trigger the Non-Competition Provision. *See* JX 368 at '072; Albertson Tr. 1004–05; Moore Tr. 97.

Marcus's trial testimony on this subject was not credible. Like Marcus's testimony, Ipreo's interpretation of the Affiliate Definition seems like something dreamed up after the fact, for purposes of litigation. It is not an interpretation that Ipreo held in real time, when negotiating and agreeing to the Transaction Agreements.

The defendants' claim about the real-world business context does not reflect the real world, and there is no credible evidence to support it. Rather, the real-world evidence

90

demonstrates that both sides shared a desire for broad restrictive covenants to protect the Joint Venture, including the Non-Competition Provision.

### d. Ipreo Breached The Non-Competition Provision.

Once the Acquisition closed, Markit became an Affiliate of Ipreo. Markit engaged in the Joint Venture Business by offering its ClearPar product, and Markit did not run its ClearPar business through the Company. Under the plain language of the Affiliate Definition, that conduct caused Ipreo to breach the Non-Competition Provision.

## C. Symbiont's Claim That Ipreo Breached The Transaction Agreements Provision

Symbiont next asserts that after the Acquisition closed, Ipreo breached the JV Agreement by failing to provide the Company with the services that Ipreo committed to supply under the Services Agreement. Symbiont failed to prove this claim.

Although Symbiont's claim implicates the Services Agreement, Symbiont does not attempt to sue under that agreement, recognizing that it is not a party to that agreement. Instead, Symbiont relies on the following provision in the JV Agreement:

> Operation of the Company. The Parties hereto agree jointly to develop and operate the Company in accordance with the Transaction Agreements. The purpose of the Company shall be to engage in the Joint Venture Business.

JVA § 2.2 (the "Transaction Agreements Provision"). The JV Agreement defines the Transaction Agreements as follows:

> "Transaction Agreements" means collectively (a) this Agreement; (b) the Contribution Agreement; (c) the [Technology Agreement]; (d) the Operating Agreement; (e) the Registration Rights Agreement; (f) the Services Agreement; and (g) the Software Escrow Agreement.

91

*Id.* § 1.49. Symbiont contends that in the Transaction Agreements Provision, Ipreo agreed to "develop and operate the Company" in accordance with the Services Agreement. Symbiont maintains that Ipreo breached the Transaction Agreements Provision by failing to fulfill Ipreo's obligations under the Services Agreement.

Read in the context of the JV Agreement as a whole, the Transaction Agreements Provision is a type of purpose clause: It defines and limits what the Company will do. The provision appears where a reader would expect to see a purpose clause. It is the second substantive provision of the JV Agreement, immediately following the provision that refers to the formation of the Company. Notably, the second sentence of the Transaction Agreements Provision is an express purpose clause: It states that "[t]he purpose of the Company shall be to engage in the Joint Venture Business."

A purpose clause that places limits on what an entity can do deprives the entity of the authority to engage in activities that otherwise would be permissible under default principles of law. A limited purpose clause can result in a court holding that the action was invalid. Historically, the *ultra vires* doctrine provided the vehicle for analyzing these issues. *See generally Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (rejecting *Carsanaro*'s analysis of post-merger derivative

standing). More recently, similar issues have arisen involving primarily contractual entities like LLCs.[25]

When evaluating whether an entity has exceeded its authority, the court focuses on the entity's actions. The same is true for the Transaction Agreements Provision. The plain language of the Transaction Agreements Provision demonstrates that its function is to confine the purpose of the Joint Venture by specifying that the Parties will "develop and operate the Company in accordance with the Transaction Agreements." The threshold question for breach is therefore whether *the Company* has acted in accordance with the Transaction Agreements. If the Company has *not* acted in accordance with the Transaction Agreements, then the question becomes whether one of the parties to the JV Agreement caused the Company to fail to act in accordance with the Transaction Agreements.

Symbiont relies on the Services Agreement, but Symbiont does not argue that the Company failed to act in accordance with its obligations under the Services Agreement.

---

[25] *See, e.g.*, *Simple Glob., Inc. v. Banasik*, 2021 WL 2587894 (Del. Ch. June 24, 2021); *Williams Field Servs. Gp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350 (Del. Ch. Sept. 25, 2019), *aff'd*, 237 A.3d 817 (Del. 2020) (ORDER); *cf. CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816 (Del. 2018) (holding that where LLC agreement provided that action taken without required approvals was "void," common law principles of ratification could not validate the act); *Absalom Absalom Tr. v. St. Gervais LLC*, 2019 WL 2655787 (Del. Ch. June 27, 2019) (same). *But see* Nat'l Conf. of Comm'rs on Uniform State Laws, *Revised Uniform Limited Liability Company Act* at 12 (2006) ("An operating agreement is a contract, and therefore all statutory language pertaining to the operating agreement must be understood in the context of the law of contracts."). As in the corporate context, the General Assembly has provided an alternative, statutory means of validating otherwise void acts. *See* 6 *Del. C.* § 18-106(e).

Symbiont instead contends that Ipreo failed to fulfill its obligations under the Services Agreement. *See* POB 63; PRB 21. The Transaction Agreements Provision does not impose an obligation on Ipreo to fulfill its obligations under the Services Agreement. The Transaction Agreements Provision focuses in the first instance on the Company.

Moreover, Symbiont failed to prove that Ipreo fell short in fulfilling its obligations under the Services Agreement. Symbiont's claim only covers the time period after the Acquisition closed. During this period, Ipreo continued to support the Company with seconded employees, including Salerno. The Company did not replace its Chief Technology Officer, but Salerno made that decision after consulting with Symbiont in an effort to conserve resources. Ipreo also provided general and administrative services to the business. The Services Agreement identified other services that Ipreo would provide, but those services were not needed until the Company's business matured. The Company never reached the point where it had reason to call on Ipreo's other commitments.

Symbiont failed to prove its claim for breach of the Transaction Agreements Provision.

## D. Symbiont's Claim That Ipreo Breached The Operating Plan Provision

Symbiont also asserts that after the Acquisition closed, Ipreo breached the JV Agreement by failing to pursue financing for the Company. Symbiont proved this claim only for the period of time after Salerno informally accepted an employment offer from Markit. Symbiont proved this claim, but it only supports an award of nominal damages.

Symbiont's legal theory relies on Section 4.1(c) of the JV Agreement. That section states:

94

[Ipreo Sub], Symbiont and the Company Board shall cause the executives and employees of the Company and this Joint Venture to conduct the operations thereof in accordance with the Operating Plan, this Agreement and the other Transaction Agreements then in effect. In the event that the Company Board determines that the operations of the Company or this Joint Venture (including any Joint Venture Entities) do not conform or are inconsistent with the Operating Plan, this Agreement or the other Transaction Agreements then in effect, the Company Board shall take all actions necessary to cause the Company (or any such Joint Venture Entity) to remedy such nonconformity and/or modify the Operating Plan.

JVA § 4.1(c) (the "Operating Plan Provision").

The plain language of the Operating Plan Provision obligated Ipreo—along with Symbiont and the Company Board—to "cause the executives and employees of the Company and this Joint Venture to conduct the operations thereof in accordance with the Operating Plan." As with the Transaction Agreements Provision, the first question in analyzing breach is whether "the executives and employees of the Company" conducted the Company's operations "in accordance with the Operating Plan." If they did *not* conduct the Company's operations in accordance with the Operating Plan, then the question becomes whether Ipreo failed to "cause the executives and employees of the Company" to conduct the Company's operations "in accordance with the Operating Plan."

The Operating Plan was an exhibit to the JV Agreement. It primarily consisted of a one-year budget setting forth cash-flow projections, plans, goals, and objectives. *See* JX 47 at '654–55. It also contained language stating that "[t]he primary strategic goal of Synaps is to close a deal with large financial institutions . . . ." *Id.* at '654.

To establish a breach of the Operating Plan Provision, Symbiont argues that "Markit never delivered to Symbiont a single [settlement] proposal in 2018. Nor did Markit have

95

any plan for how it wanted to handle Synaps post-Acquisition." POB 65 (citation omitted). Symbiont cannot base a claim for breach of the Operating Plan Provision on actions that Markit failed to take. The Operating Plan Provision did not require Markit to do anything.

Symbiont next asserts that "[b]y failing to take any steps to resolve the current dispute, Ipreo breached the JV Agreement." PRB 22. The Operating Plan Provision does not speak to this issue. It required Ipreo to cause its employees, including Salerno, to pursue the Company's Operating Plan. The dispute over the Non-Competition Provision fell outside the scope of the Operating Plan.

Closest to the mark, Symbiont contends that

Defendants did not take *any* measure to help "close" any deal with outside investors. To the contrary, Defendants did not speak to any prospective investors of Synaps following the Acquisition, much less attempt to reassure them that Synaps was still a viable enterprise. In fact, Defendants were openly instructing Salerno to *cancel* meetings he had scheduled with certain prospective investors, advice that Salerno heeded.

POB 64 (citations omitted).

The evidence does not support the full measure of this assertion. To reiterate, the Operating Plan Provision required Ipreo to "cause the executives and employees of the Company and this Joint Venture to conduct the operations thereof in accordance with the Operating Plan." The Operating Plan Provision thus contemplated that Ipreo would cause Salerno and the Company's other employees to operate the Company in accordance with the Operating Plan, which included pursuing financing.

The record evidence establishes that after the closing of the Acquisition, until April 2019, Salerno continued to attempt to implement the Operating Plan. Most notably, he

96

continued to pursue financing sources, albeit without success. Symbiont does not seriously contend otherwise.

After Salerno informally accepted a position from Markit in April 2019, he cancelled meetings with prospective investors. He already had concluded—as had Smith—that it was impossible to raise financing as long as Markit owned Ipreo's interest in the Joint Venture. On May 31, 2019, Symbiont filed this litigation. In November 2019, Salerno formally resigned as CEO and as a director of the Company.

Between April and November 2019, Ipreo was under a legal obligation to cause the Company's employees to pursue the Operating Plan. The Company's employees included Salerno. Ipreo therefore had an obligation to cause Salerno to continue to pursue the Operating Plan, including by seeking financing. Instead, Salerno cancelled meetings with prospective investors. After the filing of this litigation, all activity on the Company's behalf came to a halt. In June 2019, Salerno told the Board that "the only prudent course" was for the Company "to stop all expenditures related to its operations." JX 587 at '077.

By not causing Salerno to continue to pursue the Company's Operating Plan, Ipreo technically breached the Operating Plan Provision. For Salerno to expend efforts pursuing the Operating Plan, however, would have been futile. With Markit having decided against continuing the Joint Venture and against selling Ipreo's interest to a third party, the Company could not succeed.

Symbiont proved a technical breach of the Operating Plan Provision, but that breach will not support any remedy beyond an award of nominal damages. In addition to the

remedy discussed later in this decision, Ipreo is liable to Symbiont for $1.00 for breaching the Operating Plan Provision.

**E.** **Ipreo's Counterclaims Against Symbiont**

In response to Symbiont's claims, Ipreo asserted a series of counterclaims. The principal purpose of Ipreo's claims seems to be to defeat Symbiont's affirmative claim for breach of the Non-Competition Provision by showing a prior material breach that would excuse Ipreo's breach.

**1.** **Ipreo's Claim For Breach Of The Opportunities Provision**

Ipreo first claims that Symbiont breached the Joint Venture Agreement by failing to notify Ipreo that Symbiont was exploring the NewCo Concept. Ipreo claims that Symbiont should have presented the NewCo Concept to Ipreo so that Ipreo could evaluate whether the NewCo Concept was suitable for the Company. This claim fails because Ipreo has relied on an inapposite provision.

The provision that Ipreo invokes is titled "Business Opportunities." It states:

> In recognition of and anticipation that the Parties and their Affiliates engage and in the future may engage in similar or related lines of business to the Joint Venture Business, or in other business activities that overlap with the Joint Venture Business, the Parties agree that it is in the best interests of the Joint Venture, the Company and each of the Parties that the respective rights and duties thereof (and of their respective directors, officers, employees, shareholders, members and managers) be clarified and that there be a process and policy to determine and delineate between any agreements, arrangements, transactions or opportunities that may be suitable for the Company, any Joint Venture Entity and the Joint Venture, on the one hand, and any Party or its Affiliates, on the other hand . . . .

JVA § 4.5 (the "Opportunities Provision").

In a series of subsections, the JV Agreement establishes a procedure for each party to present to the other party "any Business Opportunities (as defined below) relating to products or services that are directly related to the Joint Venture Business, but are not then contemplated by the Operating Plan." *Id.* § 4.5(a). The "Non-Presenting Entity" then has "the right but not the obligation" to agree or consent that the Company or a related entity could pursue the Business Opportunity. *Id.*

Section 4.5(c) defines Business Opportunities as follows:

"Business Opportunities" shall mean [1] corporate or business opportunities [2] which the Company (or a Joint Venture Entity) is financially able to undertake, [3] which are, from their nature, in the line of the Joint Venture Business, and are ones in which the Company has an interest or a reasonable expectancy and [4] which, by embracing the opportunities, the self-interest of a Party or any of its Affiliates will be brought into conflict with that of the Company (or a Joint Venture Entity).

*Id.* § 4.5(c) (enumeration added). Notably, the Opportunities Provision does not encompass all opportunities that might fall within an entity version of the corporate opportunity doctrine. It only embraces opportunities "relating to products or services that [1] are directly related to the Joint Venture Business, but [2] *are not then contemplated by the Operating Plan*." *Id.* § 4.5(a) (emphasis and enumeration added). The provision excludes opportunities already contemplated by the Operating Plan for the obvious reason that those aspects of the Company's business are protected by the restrictive covenants in the JV Agreement, including the Non-Competition Provision.

Ipreo claims that Symbiont breached the Opportunities Provision by pursuing the NewCo Concept. As discussed at greater length in the Factual Background, Smith and Salerno explored the NewCo Concept while awaiting a settlement offer from Markit. After

consulting with Cravath, they believed that they had strong legal claims that could result in a settlement that would make the NewCo Concept possible. They re-engaged with the banks, prepared a new term sheet, and discussed how the NewCo Concept might work. After Cravath threatened Markit with litigation, and after Markit seemed open to a settlement, Smith and Salerno continued their preliminary discussions with the banks. At all times, however, the NewCo Concept assumed that there would be a settlement with Markit, Ipreo, and the Company. There was never a scenario in which NewCo would compete against the Company absent a settlement.

Symbiont did not breach the Opportunities Provision, because the NewCo Concept did not fall within its scope. In the abstract, it might seem logical that the NewCo Concept would breach the Opportunities Provision, but the plain language of that provision only applied to opportunities that the Company was not yet pursuing. It did not encompass the Joint Venture Business, which the Company already was pursuing.

When Smith and Salerno explored the NewCo Concept, they planned to pursue the Joint Venture Business. They only intended to do so if Markit caused Ipreo to sell its interest in the Company to a third party, or if a settlement could be reached, but they intended to pursue the Joint Venture Business. The Opportunities Provision did not protect the Joint Venture Business. Exploring the NewCo Concept therefore did not violate the Opportunities Provision.

The provision that the NewCo Concept might have breached was the Non-Competition Provision. That was the provision that protected the Joint Venture Business. If Smith and Salerno's efforts met the standard set forth in the Non-Competition Provision,

then that provision would have entitled Ipreo to a remedy. But Ipreo did not bring that claim for an obvious reason: Smith and Salerno's efforts never reached the point where they triggered the Non-Competition Provision. In addition, by the time Smith and Salerno pursued the NewCo Concept, Ipreo's prior breach of the Non-Competition Provision had suspended Symbiont's reciprocal obligations. *See* JVA § 4.4(a)(ii) ("The noncompetition provisions in Section[] 4.4(a)(i) . . . shall be tolled or suspended during any period of violation or attempted violation by a Party or any of its Affiliates.").

In short, Ipreo cannot use the Opportunities Provision to expand the scope of the Non-Competition Provision or escape the effect of its prior breach. Ipreo failed to prove a breach of the Opportunities Provision.

### 2. Ipreo's Claim For Breach Of The Non-Interference Clause

Ipreo next claims that Symbiont breached the JV Agreement by trying to secure financing for the NewCo Concept from the banks that were prospective investors in the Company. Ipreo proved this claim, but is entitled only to nominal damages.

As part of the Non-Solicitation Provision, Symbiont agreed it would not

> interfere with or attempt to interfere with, in any way, the relationships of the Company, Ipreo, Symbiont or their respective Affiliates with any employees, officers, managers, agents, suppliers, vendors, independent contractors, Customers or otherwise.

JVA § 4.4(a)(i)(z) (the "Non-Interference Clause"). Ipreo claims that Symbiont breached the Non-Interference Clause by contacting the banks about the NewCo Concept.

The plain language of the Non-Interference Clause does not contain any specific reference to financial sources, so Ipreo must rely on other language to support its claim.

101

Ipreo first argues that the banks were also prospective customers of the Company and claims that Symbiont violated the Non-Interference Clause by contacting them. As noted previously, the JV Agreement defines "Customer" to mean "(x) any then current customer of the Company or the Joint Venture, and (y) any Person that has been a customer of the Company or the Joint Venture at any time within one (1) year prior to that date." *Id.* § 4.4(a)(iii). Because the Company never launched, it never had "Customers" within the meaning of this provision. Nor did the nonbinding term sheet require the banks to become customers in the future; it only contemplated that the banks and the Company would negotiate in good faith regarding that possibility.

Ipreo also argues that the Non-Interference Clause protects the Company's relationships generally. It is implausible to think that the Non-Interference Clause protected every relationship that the Company might have had. At the same time, Ipreo has made a convincing argument that the Non-Interference Clause protected—at a minimum—the Company's relationships with the four banks who had signed the term sheet. Although the term sheet was nonbinding as to the substance of the deal, it evidenced a meaningful relationship between the Company and the signatory banks and created a commitment to negotiate in good faith. The term sheet also contained binding provisions addressing exclusivity, confidentiality, the making of public statements about the Joint Venture, and governing law. JX 275 at '963.

Nevertheless, Symbiont's contacts with the banks after the closing of the Acquisition did not breach the Non-Interference Clause. As soon as the Acquisition closed, Ipreo breached the Non-Competition Provision. Under the terms of the JV Agreement,

102

Ipreo's pre-existing breach suspended Symbiont's obligations under the Non-Solicitation Provision. *See* JVA § 4.4(a)(ii).

Ipreo has pointed to one email that Smith sent to one of the Company's prospective investors before the Acquisition closed. On June 25, 2018, Smith emailed Bill Hartnett at Citi after hearing from Salerno that Citi was withdrawing from the investor group. JX 429. Disappointed, Smith requested "the opportunity to discuss an alternative path forward that does not include IPREO or IHS Markit." *Id.*

Smith's email to Hartnett breached the Non-Interference Provision, but not in a material way. When Smith sent his email, Markit and Ipreo had announced the Acquisition, and Citi was pulling out of the investment. Salerno feared that other banks would follow suit, and Smith was hoping to explore alternatives. Nothing came of those discussions.

Ipreo proved a technical breach of the Non-Interference Provision, but that breach will not support any remedy beyond an award of nominal damages. Symbiont is therefore liable to Ipreo for $1.00 for breaching the Non-Interference Provision. This award offsets the $1.00 that Ipreo owed to Symbiont for breaching the Operating Plan Provision.

### 3. Ipreo's Claim That Symbiont Breached The Operating Agreement

Ipreo next contends that Symbiont breached Section 3.01(b) of the Operating Agreement by failing to deliver "an MVP of the SmartLoans Platform to Synaps by May 11, 2017, or by August 11, 2017, if extended by Salerno." DOB 84–85 (citing OA §§ 1.01, 3.01(b)). This claim fails because the Operating Agreement did not impose a contractual obligation on Symbiont to deliver an MVP.

Section 3.01(b) describes Symbiont's obligation to make an initial capital contribution. In full, it states:

> The Symbiont Member's initial Capital Contribution and the number of Units and Symbiont Restricted Units it is deemed to beneficially own are set forth opposite its name on Schedule A attached hereto.
>
> The Symbiont Member shall make such initial Capital Contribution in the amount of $360,000 on or prior to the date that is six months after the date hereof (the "Symbiont Cash Contribution Deadline");
>
>> *provided, however*, that if Symbiont delivers to the Company the Minimum Viable Product on or prior to the Symbiont Cash Contribution Deadline the obligation to make such Capital Contribution shall be extinguished and forever waived;
>>
>> *provided, further*, that if Symbiont has not delivered a Minimum Viable Product by the Symbiont Cash Contribution Deadline the Symbiont Cash Contribution Deadline may be extended for a period of up to three (3) months by the Chief Executive Officer in his sole and absolute discretion to the extent it determines significant progress has been made toward the Minimum Viable Product (the "Extended MVP Deadline").
>
> In the event the Symbiont Cash Contribution Deadline is extended in accordance with the preceding sentence and Symbiont does not then deliver the Minimum Viable Product by the Extended MVP Deadline, Symbiont shall contribute cash in the amount of $360,000 as its initial Capital Contribution.

OA § 3.01(b) (reformatted).

This provision contains only one affirmative obligation: "The Symbiont Member shall make such initial Capital Contribution . . . ." *Id.* (the "Contribution Requirement"). Two provisos follow. Neither imposes an affirmative obligation to deliver the MVP.

The first proviso contemplates that Symbiont's obligation under the Contribution Requirement would be "extinguished and forever waived" *if* an event occurred, namely the

104

delivery of the MVP. That proviso makes the waiver of the Contribution Requirement a consequence of delivering the MVP. It did not obligate Symbiont to deliver the MVP. *See Restatement (Second) of Contracts* § 230 (1981), Westlaw (database updated June 2021) ("[I]f under the terms of the contract the occurrence of an event is to terminate an obligor's duty of immediate performance or one to pay damages for breach, that duty is discharged if the event occurs.").

The second proviso does not impose an obligation on Symbiont either. Instead, it permits Salerno to extend the deadline for Symbiont to make its cash contribution if he determined that "significant progress has been made" toward the MVP. The second proviso gave Salerno the power to grant an extension. It did not obligate Symbiont to deliver the MVP.

The final sentence of the provision also does not impose an obligation to deliver the MVP. The final sentence makes clear that if Salerno extends the deadline for Symbiont to pay its cash contribution, and if Symbiont does not deliver the MVP, then Symbiont is required to make a contribution of $360,000. The final sentence thus contemplated a situation in which Symbiont did not deliver the MVP.

Ipreo's claim for breach of the Contribution Requirement misapprehends the terms of the provision. The Operating Agreement did not require that Symbiont deliver the MVP. Ipreo therefore cannot ground a claim for breach of the Operating Agreement on Symbiont's failure to deliver the MVP.

### 4. Ipreo's Claim That Symbiont Breached The Transaction Agreements Provision

Because the Operating Agreement does not give Ipreo a basis to claim that Symbiont breached an obligation to deliver an MVP, Ipreo turns to other provisions. In one of its claims, Ipreo asserts that Symbiont breached the Transaction Agreements Provision, which provides that "[t]he Parties hereto agree jointly to develop and operate the Company in accordance with the Transaction Agreements." JVA § 2.2. Ipreo contends that Symbiont breached the Transaction Agreements Provision by failing to deliver a minimum viable product and other technology as contemplated by the Technology Agreement. DOB 84–85.

Although Symbiont itself invoked the Transaction Agreements Provision against Ipreo for allegedly failing to fulfill its obligations under the Services Agreement, Symbiont vigorously disputes Ipreo's ability to assert a comparable claim. Symbiont raises a series of inapt arguments, observing that (i) only a party can sue under a contract, and Ipreo is not a party to the Technology Agreement, (ii) a third-party beneficiary can sue under a contract, but the Technology Agreement disclaims third-party beneficiaries, and (iii) a contract can incorporate another contract by reference, but the JV Agreement does not incorporate the Technology Agreement.

Each of these arguments is a distraction. Just like Symbiont, Ipreo is suing under the JV Agreement for breach of a provision in the JV Agreement. Ipreo has standing to enforce obligations in the JV Agreement. The question is whether Symbiont could breach

the Transaction Agreements Provision by failing to comply with its obligations under the Technology Agreement.

It would not be hard to draft such a provision. As discussed previously, however, the Transaction Agreements Provision is a type of purpose clause. It places limits on what the Company can do by obligating the Company to operate in accordance with the Transaction Agreements. The threshold question for breach is whether the Company has done so. If the Company has not acted in accordance with the Transaction Agreements, *then* the question becomes whether one of the parties to the JV Agreement caused the Company to fail to fulfill that obligation.

Ipreo relies on the Technology Agreement, but Ipreo does not argue that the *Company* failed to act in accordance with the Technology Agreement. Ipreo instead contends that Symbiont failed to fulfill its obligations under the Technology Agreement. The Transaction Agreements Provision does not impose an obligation on Symbiont to fulfill its obligations under the Technology Agreement. The Transaction Agreements Provision therefore will not support Ipreo's claim of breach.

### 5. Ipreo's Claim For Breach Of The Operating Plan Provision

As an alternative means of claiming that Symbiont breached an obligation to deliver an MVP, Ipreo relies on the Operating Plan Provision. The pertinent language states that "[Ipreo Sub], Symbiont and the Company Board shall cause the executives and employees of the Company and this Joint Venture to conduct the operations thereof in accordance with the Operating Plan, this Agreement and the other Transaction Agreements then in effect." JVA § 4.1(c). Ipreo sought to prove that Symbiont's failure to develop the

107

Company's technology caused the Company to miss the objectives identified in the Operating Plan. DRB at 31.

The plain language of the Operating Plan Provision would support a claim against Symbiont for failing to "cause the executives and employees of the Company and this Joint Venture to conduct the operations thereof in accordance with the Operating Plan, this Agreement and the other Transaction Agreements." Like the Transaction Agreements Provision, the Operating Plan Provision examines whether "the executives and employees of the Company and this Joint Venture" complied with those obligations. If they did not, then a claim for breach could exist against a party that failed to cause them to comply with their obligations. But to prevail, the party asserting the claim must make the predicate showing that "the executives and employees of the Company and this Joint Venture" failed to comply with their obligations.

Rather than seeking to prove that the "the executives and employees of the Company and this Joint Venture" failed to comply with their obligations, Ipreo sought to prove that Symbiont failed to comply with its obligations. The Operating Plan Provision will not support such a claim.

The terms of the Operating Plan also will not support a claim for breach. The Operating Plan stated that "[o]ver the first six-to-nine months, Synaps must achieve the following technological tasks," and it identified those objectives as:

> (a) complete the initial version of the "Smart Loan" distributed ledger network, (b) adapt the LTS settlement system to work with the distributed ledger, (c) build the initial version of a "Smart Loan Agent" tool to service syndicated loan facilities and (d) provide a capability for banks to import

108

servicing events from the distributed ledger into existing commercial lending systems.

JX 47 at '654. The Operating Plan did not frame the objectives as contractual obligations that Ipreo could enforce against Symbiont. They were goals for the Company to achieve.

The Operating Plan Provision therefore does not provide Ipreo with a basis to sue Symbiont.

## F.     The Reciprocal Claims Based On The Battle For Salerno

Each side claims that the other breached the Non-Solicitation Provision by discussing employment with Salerno while he remained CEO of the Company. Ipreo claims that Smith breached the Non-Solicitation Provision when he spoke with Salerno about leading NewCo. Symbiont claims that Ipreo breached the Non-Solicitation Provision when Markit successfully recruited Salerno. Both claims fail because the parties waived the provision and agreed to compete freely for Salerno's services.

In the Non-Solicitation Provision, Symbiont and Ipreo agreed that they would not "induce, solicit or attempt to influence any employee or consultant of the Company, Ipreo, Ipreo Holdings, Symbiont or their respective Affiliates to terminate his or her employment with any such Person . . . ." JVA § 4.4(a)(i)(z). After Markit announced the Acquisition, once it became clear that the Company could not succeed with Markit in the capital structure, Symbiont and Ipreo each solicited Salerno's employment.

Both sides' efforts to solicit Salerno would have violated the plain language of the Non-Solicitation Provision, but their claims fail for the same reason. As discussed in the

Factual Background, Smith and Marcus agreed that both sides could solicit Salerno. In substance, they waived the Non-Solicitation Provision.

To avoid the implications of the oral waiver, Ipreo cites Section 6.7 of the JV Agreement, which provides that "[n]o waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving." *Id.* § 6.7. That provision is not dispositive, because "contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision." *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1229 (Del. Ch. 2000); *accord Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972).

Although permissible, oral waivers of written contracts "are not favored for a host of pragmatic and public policy reasons." *Tunney v. Hilliard*, 2008 WL 3975620, at *5 (Del. Ch. Aug. 20, 2008). Thus, the oral waiver "must be of such 'specificity and directness' that there is no doubt regarding the parties' intention to change the formally solemnized written contract." *Res. Dev. LLC v. Severn Sav. Bank, FSB*, 2007 WL 4054231, at *8 (Del. Ch. Nov. 9, 2007), *aff'd*, 961 A.2d 521 (Del. 2008).

The evidence in this case establishes a sufficiently specific and direct oral waiver. Both Symbiont and Markit crafted settlement proposals that contemplated hiring Salerno. Marcus and Smith then spoke by phone, discussed the issue of Salerno's future employment, and agreed that both sides could pursue him. Marcus Tr. 541–42; Salerno Tr. 682; Salerno Dep. 12–13; *see* JX 577 at '954; JX 578; *see also* JX 549 at '812; JX 551.

110

Because of the oral waiver, neither side breached the Non-Solicitation Provision by soliciting Salerno's employment.

## G. The Remedy

The only claim that supports a non-nominal remedy is Symbiont's claim that Ipreo breached the Non-Competition Provision. As its preferred remedy, Symbiont invokes Section 4.4(b)(iii) of the JV Agreement. In that provision, Symbiont and Ipreo agreed that if either of them violated the restrictive covenants in Section 4.4, then the non-breaching party and the Company "shall be entitled to . . . an equitable account of all earnings, profits and other benefits arising from [the] violation. . . ." JVA § 4.4(b)(iii) (the "Remedy Provision"). Symbiont proved that Ipreo breached the Non-Competition Provision when Markit became Ipreo's Affiliate and operated its ClearPar business outside of the Company. Symbiont therefore asks the court to award it the profits that Markit received from its ClearPar business. Symbiont contends that as a 50% member of the Company, it should receive a damages award equal to 50% of ClearPar's profits.

As a general matter, a remedy for breach should seek to give the non-breaching party the benefit of its contractual bargain. *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000). Delaware is a pro-contractarian state. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 2012 WL 3201139, at *26 n.211 (Del. Ch. Aug. 7, 2012). Requiring parties to live with "the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length." *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002).

111

In this case, the parties agreed on a specific remedy that would apply in the event of a breach of the Non-Competition Provision. In its entirety, the Remedy Provision states:

> Each of the Parties agree that the other Party and the Company and any other Joint Venture Entities shall be entitled to preliminary and permanent injunctive relief, without the necessity of proving actual damages or posting any bond or other security, as well as an equitable account of all earnings, profits and other benefits arising from any violation of this Section 4.4, which rights shall be cumulative and in addition to any other rights or remedies to which such Person may be entitled.

JVA § 4.4(b)(iii).

Through two additional provisions, the parties took steps to ensure that they received the benefit of the restrictive covenants and remedies that they had bargained for. First, they agreed that "[t]he Territory, scope, duration and other provisions of this Section 4.4 are reasonable given the nature of the Parties' and the Company's access to Confidential Information of the Parties and other circumstances." *Id.* § 4.4(b)(i). Second, they agreed that "[t]he duration, scope, Territory and other provisions of this Section 4.4 have been specifically negotiated by sophisticated parties." *Id.* § 4.4(b)(ii). The Remedy Provision also implements the parties' agreement that "[a]ll revenue associated with the following loan trade settlement products and services shall accrue exclusively to the Joint Venture and the Company: (a) settlement of primary loan trades; (b) settlement of secondary loan trades; (c) lending agent services; and (d) *SmartLoans* services." *Id.* § 4.10.

The Remedy Provision is a specific remedy that the parties tailored for "any violation of Section 4.4," which is the section of the JV Agreement that includes the Non-Competition Provision. That remedy should be enforced.

The plain language of the Remedy Provision entitles the non-breaching party, the Company, and any other Joint Venture Entities "to an equitable account of all earnings, profits and other benefits arising from any violation." *Id.* § 4.4(b)(iii). The Non-Competition Provision states that it remains in effect for one year after the Company "ceases to engage in the Joint Venture Business." *Id.* § 4.4(a)(i).

Ipreo argues that because the Remedy Provision refers to an "equitable account," a party invoking the Remedy Provision must prove that it otherwise has met all of the requirements for an equitable accounting under common law. That is incorrect. Parties can agree contractually to the availability of particular remedies, and they frequently agree on the availability of injunctive relief and specific performance. The parties' contractual agreement is sufficient, standing alone, to support granting that remedy. *See Gildor v. Optical Sols., Inc.,* 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) (specific performance); *Kansas City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) (injunctive relief). That said, the provision does not bind the court, and the court can decline to enforce that remedy on the facts.

Ipreo attempts to construe an "equitable account" as a narrow remedy that is only available "where (i) there are mutual accounts between parties, (ii) a fiduciary relationship exists and the defendant has a duty to account, or (iii) the accounts are all on one side but there are circumstances of great complication." DOB 63 (quoting *Bus. Funding Gp., Inc. v. Architectural Renovators, Inc.*, 1993 WL 104611, at *2 (Del. Ch. Mar. 31, 1993)). More generally, the accounting remedy historically provided the exclusive method for settling the affairs of a general partnership. *See* J. William Callison & Maureen A. Sullivan,

113

*Partnership Law & Practice* § 13:4 (2020–2021), Westlaw (database updated October 2020). The parties formed a joint venture, which was classically a partnership relationship. *See* 48A C.J.S. Joint Ventures § 3. The parties in this case formed a joint venture but specified that they were not forming a partnership, preferring a purely contractual relationship. It is both fitting and unsurprising that having formed a non-fiduciary joint venture, they crafted a contractual substitute for the standard accounting remedy.

The question therefore is how to measure the time period during which the breach of the Non-Competition Provision took place, given that Ipreo must account for the profits that its Affiliate received during that period. Symbiont contends that the breach began when the Acquisition closed, continues to this day, and will continue into the future, because the Company has never dissolved and hence never ceased conducting business. That is not realistic.

The Company's fate was sealed in August 2018, when Markit's management team decided that they would not continue to operate within the Joint Venture framework, but also would not sell Ipreo's interest. Salerno and the Company struggled on, but Salerno's efforts effectively came to an end in April 2019, when he informally accepted Markit's offer of employment. Salerno's time with the Company ended in November 2019, when he resigned from his positions with the Company. From that point on, the Board has been deadlocked, and the Company has lacked a CEO. As discussed later, this decision orders dissolution of the Company. There are arguments in favor of using each of these dates as the point at which the Company's operations ended.

The most apt endpoint is November 2019, when Salerno formally resigned from his positions with the Company. Until November 14, Salerno remained CEO. He was obligated to pursue the Company's business, and Ipreo was obligated to cause him to pursue the Company's business. Smith insisted that Salerno continue doing so. Consistent with those obligations, Ipreo invoiced the Company for services rendered through November 2019. JX 591; JX 592; JX 595; JX 597; JX 602; JX 605. Once Salerno left, there was no one to lead the Company. On November 25, Salerno formally resigned as a director, leaving the Board deadlocked. The Non-Competition Provision remained in effect for one year after that. Under a faithful application of the parties' agreement, the damages period runs through November 2020.

Using a longer period, such as the date of the court's order dissolving the Company, would fail to recognize that the Company effectively stopped conducting business long ago. Since November 2019, the Company has persisted to preserve the parties' litigation positions, rather than as a viable business. Using the date of this court's order thus could generate an excessive damages award. That is all the more true for Symbiont's request for the present value of a perpetual award. On balance, a later date is excessive.

Using a shorter period fails to recognize that Salerno continued to attempt to carry out the Company's business plan despite Markit's presence in the capital structure and Markit's foot-dragging with respect to potential paths to resolution. The strongest alternative candidate is April 2019, when Salerno informally accepted a position from Markit and began cancelling meetings with investors. If Salerno had resigned at that point, and if Ipreo had stopped billing the Company for services, then it might be appropriate to

use the one-year anniversary of that date as the end of the damages period. Instead, Salerno stayed on through November 2019, and Ipreo billed the Company for services through November 2019. Salerno and Ipreo thus acted as if the Company was still operating.

At trial, Symbiont presented evidence of the after-tax profits that Markit generated from its ClearPar business. Symbiont established the amounts of Markit's actual profits through September 30, 2020. Symbiont provided reliable estimates of Markit's forecasted profits for periods beyond that. At this point, the parties should be able to agree on Markit's actual profits for the relevant period.

It is difficult to calculate mid-month profits rather than month-end profits because accounting typically happens on a monthly basis. With Salerno resigning as CEO on November 14 and resigning as a director on November 25, the two proximate options for an end-of-month cutoff for the damages period are October 31, 2020, and November 30, 2020. "[D]oubts about the extent of damages are generally resolved against the breaching party." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015). This decision therefore uses November 30, 2020.

At trial, Symbiont proved that Markit's ClearPar business generated pre-tax profits of $163.3 million from the closing of the Acquisition until September 30, 2020. JX 634 Ex. K. Symbiont's expert calculated taxes on those profits of $24.4 million. *Id.* To adjust for the time-value of money, Symbiont's expert determined the present value of ClearPar's after-tax profits as of September 30, 2020, were $142 million. *Id.* Ipreo is liable for this amount plus an additional amount for the after-tax profits that ClearPar generated in

October and November 2020 (the "Damages Award"). The Damages Award will be adjusted to reflect its value in dollars as of November 30, 2020.

Under the Remedy Provision, the Company, any other Joint Venture Entities, and Symbiont as the non-breaching member are entitled to an equitable accounting of those profits. There are no other Joint Venture Entities, so the question is how to allocate the Damages Award as between the Company and Symbiont.

Symbiont asks the court to award it half of the Damages Award, reflecting its 50% stake in the Company. The other obvious alternative would be to direct Ipreo to pay the Damages Award to the Company. As discussed in the next section, it is no longer reasonably practicable for the Company to continue in business. The Company therefore needs to be dissolved, and the court will order that relief. There will necessarily be some expenses associated with winding up the Company's affairs and filing a certificate of cancellation. Directing Ipreo to pay the award to the Company will enable it to pay those expenses and its other debts. The Company then will be able to make a liquidating distribution to its members. Half of the amount of the liquidating distribution will go to each member, resulting in Symbiont receiving approximately the damages it seeks and Ipreo receiving the rest. Because this result provides a source of funds to take care of any issues associated with dissolution, the court allocates the Damages Award to the Company.

Ipreo contends that the court should not grant any award because Symbiont did not suffer any actual damages. When parties have agreed to a contractually defined remedy, such as a liquidated damages provision, the party invoking the provision need not prove actual damages. *See W & G Seaford Assocs., L.P. v. E. Shore Mkts., Inc.*, 714 F. Supp.

117

1336, 1350–52 (D. Del. 1989). "It matters not whether actual damages are proven, or that the liquidated damages are substantially larger than the actual damages, so long as the liquidated damages were a reasonable estimate of the damages which would be caused." *S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*, 1997 WL 817883, at \*2 (Del. Super. May 21, 1997).

Here, the general rule that a party need not prove actual damages when seeking a contractual remedy applies with particular force, because the Remedy Provision states that the non-breaching party and the Company are entitled to the specified relief "without the necessity of providing actual damages." JVA § 4.4(b)(iii). This phrase directly modifies and applies to the non-breaching party's entitlement to injunctive relief, but the provision immediately states that the non-breaching party is also entitled to "an equitable account of all earnings, profits and other benefits" arising from the breach. *Id.* The plain language of the Remedy Provision makes clear that the language obviating the need for the non-breaching party to prove damages applies to all of the specified remedies, including the equitable account of earnings, profits, and other benefits.

The central question in evaluating whether to enforce the damages component of the Remedy Provision is whether the calculation represents a reasonable remedy for the breach, as opposed to an unjustified penalty.[26] When evaluating whether to enforce a

---

[26] *See Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006); *Smart Sand, Inc. v. US Well Servs. LLC*, 2021 WL 2400780, at \*6 & n.70 (Del. Super. June 1, 2021); *Kold, LLC v. Croman*, 2014 WL 7008431, at \*5 (Del. Super. Nov. 25, 2014).

contractual damages remedy, a court applying Delaware law considers whether, at the time of contracting, the damages that would result from a breach would be "uncertain or incapable of accurate calculation." *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 48 (Del. 1997). A court also considers whether the amount called for could be "unconscionable or not rationally related to any measure of damages a party might conceivably sustain." *Id.* at 48–49 (citations omitted).

The Remedy Provision satisfies both tests. First, when negotiating the JV Agreement, the parties faced a situation where the damages from a breach of the restrictive covenants would be uncertain or incapable of accurate calculation. When the parties formed the Joint Venture, they agreed to pursue the Joint Venture Business exclusively through the Company. They recognized explicitly in the JV Agreement that by forming and operating the Company, each side made itself vulnerable to competition from its contractual counterparty or an Affiliate.

The parties also knew that they were embarking on a new venture involving pioneering technology. Their business plan had the potential to revolutionize the industry and generate massive profits, but the venture also would be fragile, particularly in its early years. There were many ways that a participant in the Joint Venture could violate the restrictive covenants and cause the venture to fail. In addition to the Non-Competition Provision, the restrictive covenants in Section 4.4 proscribe a wide range of potentially damaging activities.

These factors created significant uncertainty as to damages. At the time of contracting, it was not possible to foresee how a counterparty or its Affiliate might compete

119

with the Company, the extent of the competition, or what the resulting damages might be. Courts generally recognize the difficulties associated with calculating damages arising from the breach of restrictive covenants.[27] Courts can attempt to derive a figure based on lost opportunities and the profits that a firm might have achieved absent the competitive activity, but questions loom as to causation and quantification. It also was not possible to foresee how other types of behavior that violated the restrictive covenants might harm the Company. The parties to the JV Agreement thus faced a situation where the damages associated with breach would be uncertain.

The uncertainty facing the parties to the JV Agreement at the time of contracting was even more acute, particularly if the breach of a restrictive covenant caused the venture to fail while still in its early stages. Courts may refuse to award lost profits from a new business, deeming evidence of lost profits to be too speculative, uncertain, and remote when there is no history of prior profits.[28] The parties thus faced a situation where the

---

[27] *See, e.g.*, *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *21 (Del. Ch. June 20, 2019) (discussing "massive and complex inquiry" required to determine the harm caused by a breach of a restrictive covenant and "the difficulties a court faces in deriving a reliable valuation conclusion" utilizing discounted cash flow methodology); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *18 (Del. Ch. Jan. 17, 2007) ("Measuring the effects of breaches [of non-competition provisions] involves a costly process of educated guesswork with no real pretense of accuracy."); *Singh v. Batta Env't Assocs., Inc.*, 2003 WL 21309115, at *9 (Del. Ch. 2003) (explaining that it is "impossible to calculate with any certainty the full extent of the damage" inflicted by continued violation of a non-competition provision).

[28] *See In re Heizer Corp.*, 1990 WL 70994, at *3 (Del. Ch. May 25, 1990) (declining to award lost profits for a "'start-up' company whose ability to generate profits, in any amount, was entirely speculative"). *Compare Re v. Gannett Co.*, 480 A.2d 662, 668 (Del.

damages suffered by the Company and the non-breaching party could have been incapable of calculation.

These dynamics gave rise to an appropriate situation for the crafting of a contractual remedy. The first element of the test for enforcing the Remedy Provision is therefore satisfied.

The second question is whether the remedy selected is rationally related to a measure of damages that a party might conceivably obtain. *Brazen*, 695 A.2d at 48. The agreed-upon remedy must also not be unconscionable. *Id.*

Here, the parties agreed to a contractual remedy that tracks a standard measure of damages that courts deploy in cases involving breaches of restrictive covenants: the profits that the venture could have obtained but for the prohibited conduct.[29] The parties to the JV Agreement simplified the resulting calculation by requiring that the breaching party identify—i.e., account for—"all earnings, profits, and other benefits arising from" the violation. The non-breaching party, the Company, and any other Joint Venture Entities are

---

Super. 1984), *aff'd*, 496 A.2d 553 (Del. 1985) (stating general rule), *with Mobile Diagnostics, Inc. v. Lindell Radiology, P.A.*, 1985 WL 189018, at *4 (Del. Super. July 29, 1985) (explaining that rule is not absolute).

[29] *See, e.g.*, *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *24 (Del. Ch. Dec. 19, 2017) (enforcing liquidated damages provision where amount payable "correlates precisely to the amount payable in the event of . . . performance"); *Concord Steel, Inc. v. Wilm. Steel Processing Co., Inc.*, 2009 WL 3161643, at *15–16 (Del. Ch. Sept. 30, 2009) (awarding estimated lost profits arising from defendant's breach of non-competition provision); *All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *10 (Del. Ch. Aug. 9, 2004) ("The proper measure of damages for breach of a covenant not to compete is [plaintiff's] lost profits.").

then entitled to an equitable share of those earnings, profits, and other benefits. The Remedy Provision thus reaches a result similar to how a court could approach the remedial calculus, while simplifying the steps in the calculation. The Remedy Provision is thus rationally related to a measure of damages that a non-breaching party might conceivably obtain.

The damages award that the Remedy Provision produces is also not unconscionable. To provide an alternative estimate of the potential damages, Symbiont's expert used contemporaneous financial projections that Salerno prepared to value the Company using a discounted cash flow methodology. Salerno prepared his projections in the ordinary course of business, contemporaneously with events, for use in managing the business and in raising financing from investors. Salerno Tr. 645–48. He viewed the projections as "certainly achievable." *Id.* at 648. If anything, he viewed them as conservative because they did not reflect potential growth in the syndicated loan market. *Id.* at 793; *see also* JX 17. There is no evidence that anyone who reviewed the projections—including Ipreo, the Ipreo Sponsors, and dozens of potential outside investors—ever expressed the view that they were speculative, overly optimistic, or otherwise unreliable.

Using a discounted cash flow analysis and conservative assumptions, Symbiont's expert derived two estimates of the Company's enterprise value. Using one reasonable set of inputs, he opined the Company had an enterprise value of between $229.1 million and $317.1 million, with Symbiont's share of that value (after accounting for dilutive investments by financing sources) ranging from $32.6 million to $45.1 million. *See* JX 634 Exs. F & G. Under a second reasonable set of inputs, he opined the Company had an

122

enterprise value of between $115.3 million and $158.1 million, with Symbiont's share of that value (again after accounting for dilutive investments by financing sources) ranging from $26.4 million to $36.3 million. *Id.* Exs. H & I. Under the Remedy Provision, Symbiont's share of a liquidating distribution will likely be in the vicinity of $70 million. That amount is higher than the alternative calculations that the expert provided, but not so far off as to suggest that the Remedy Provision generates an unconscionable result.

## H. Dissolution Of The Company

Ipreo seeks an order dissolving the Company. Symbiont opposes that relief and maintains that with the benefit of a ruling from the court—and perhaps a trustee to break the Board-level deadlock—the parties will be able to work together to pursue the Joint Venture Business.

A court has the statutory authority to dissolve an LLC when it is no longer reasonably practicable to carry on the company's business. *See* 6 *Del. C.* § 18-802. A court also can dissolve a limited liability company on equitable grounds. *In re Carlisle Etcetera LLC*, 114 A.3d 592, 601 (Del. Ch. 2015). The court need not consider whether principles of equity call for dissolving the LLC, because statutory grounds plainly exist.

A court can find that it is no longer reasonably practicable to carry on the business of an LLC when an irrevocable deadlock exists or when there is effectively no business to operate. *Fisk Ventures, LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13, 2009), *aff'd*, 984 A.2d 124 (Del. 2009) (ORDER). Both scenarios exist here.

First, the Company is deadlocked at the Board and member level. Since Salerno resigned, the Board has consisted of one member appointed by Symbiont and a second

appointed by Ipreo. The two members of the Board have not been able to agree on anything. The members are also deadlocked at the member level because each owns 50% of the member interests in the Company, and Symbiont and Ipreo/Markit disagree fundamentally over the future of the Company.

Second, the Company has no remaining business. It has no employees, no officers, and no CEO. It has no product, no customers, and no revenue. It lacks cash or a prospect for obtaining financing. It may be that the Company's business plan of challenging ClearPar remains viable, but it is not reasonably practicable for the Company to pursue that business plan with Markit in its capitalization table.

Symbiont knows that the Company is deadlocked and has no business. Nevertheless, Symbiont argues that if this court were to appoint a trustee to break the current deadlock, then Symbiont and Ipreo/Markit somehow would collaborate to restart the Joint Venture. That is a fantasy. Symbiont and Ipreo/Markit could not agree on a business resolution after the announcement of the Acquisition, could not agree on a business resolution after the Acquisition closed, could not agree on a settlement before the filing of this litigation, and could not resolve this litigation short of a post-trial decision. During that period, until April 2019, Smith and Salerno were largely aligned and comprised a majority of the Board. Yet they could not move the business forward. A deadlock-breaking trustee might provide a temporary solution to the current Board-level impasse, but the introduction of a trustee would not alleviate the basic conflict of interest between Symbiont and the Company, on the one hand, and Ipreo and Markit, on the other. A Board assisted by a deadlock-breaking trustee would not do any better than Smith and Salerno.

124

Symbiont's real motivation for keeping the Company alive is to maximize its damages award. As Symbiont sees it, as long as the Company remains in existence, and as long as Markit continues to operate its ClearPar business outside of the Company, then Ipreo will remain in breach of the Non-Competition Provision, and damages will continue to accrue under the Remedy Provision. Symbiont therefore sought a damages award for "as much as $501.8 million depending on when, if ever, the joint venture is terminated." PRB 29.

Symbiont's theory rests on a flawed premise. Symbiont posits that Ipreo will be bound by the Non-Competition Provision as long as the Company remains in existence, but the Non-Competition Provision only remains in effect for one year after the Company "ceases to engage in the Joint Venture Business." JVA § 4.4(a)(i). The Company ceased engaging in any business by the end of November 2019. Thus, as this decision has already held, the damages period runs through November 2020. Adding incremental years to Symbiont's damages claim was never a good reason to keep the Company alive. At this point, that reason no longer exists.

The Company will be dissolved because it is no longer reasonably practicable for the Company to carry on its business. *See* 6 *Del. C.* § 18-802. The final judgment entered in this action will provide that the Company is dissolved and appoint a Delaware attorney to serve as trustee to wind up the Company's affairs. The fees and expenses of the trustee will have administrative priority over all other claims against the Company.

125

## I.      Symbiont's Claim For Tortious Interference Against Markit

Symbiont has asserted a claim for tortious interference against Markit. Determining whether Markit should be liable for tortious interference will require a complex balancing of different factors. *See NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *25–36 (Del. Ch. Nov. 17, 2014). This decision has covered significant ground, and it would add materially to its length to take on the tortious interference claim. As a practical matter, it should be unnecessary to determine whether Markit tortiously interfered with the JV Agreement. A plaintiff is only entitled to a single recovery. If Ipreo pays the damages award, then Symbiont will have no basis to pursue Markit. A judgment holding Markit liable becomes pertinent if Ipreo fails to satisfy the judgment, in which case Markit's status as a party jointly and severally liable with Ipreo would provide a separate and independent source of recovery.

The facts of this case make it unlikely that pursuing Markit will be necessary. Ipreo is a significant entity worth billions of dollars. Ipreo generates millions of dollars of profit each year. Symbiont should not face difficulty recovering from Ipreo.

Given these dynamics, the court will not adjudicate the claim for tortious interference against Markit at this time. That claim is severed and stayed. If Ipreo satisfies the judgment, then it will be moot. If Ipreo fails to satisfy the judgment, then the claim can be revived. To be clear, any final judgment entered in this action will be a partial final judgment that will not extinguish the separate claim for tortious interference against Ipreo.

## III.    CONCLUSION

The court will enter final judgment in favor of Symbiont and against Ipreo. The parties will confer on the precise amount of the Damages Award. Symbiont will receive pre- and post-judgment interest on the Damages Award from November 30, 2020, until the date of payment, with interest calculated at the legal rate and compounded quarterly. Symbiont is also entitled to an award of costs as the prevailing party.

The parties will incorporate the court's rulings into a final order that has been agreed as to form. If there are other issues that the court needs to address before a final order can be entered, then the parties will prepare a joint letter that identifies the issues and proposes a procedure for resolving them.